## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:**<br><br>**TRIPLE CROWN MEDIA, INC., et al.**[1]<br><br>**Debtors.** | **Chapter 11**<br><br>**Case No. 09-_____**<br><br>**Jointly Administered** |

### DEBTORS' MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(A), 507(A)(4) AND 507(A)(5) (A) AUTHORIZING THE DEBTORS TO PAY PREPETITION WAGES AND SALARIES, AND HONOR CERTAIN EMPLOYEE BENEFITS, (B) DIRECTING ALL BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS, AND (C) AUTHORIZING THE DEBTORS TO HONOR WORKERS' COMPENSATION OBLIGATIONS

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their proposed undersigned counsel, hereby move this Court (the "Motion") for entry of an Order (A) authorizing the Debtors to pay prepetition wages and salaries, and honor certain Employee (as defined below) benefits; (B) directing all banks to honor prepetition checks for payment of prepetition Employee obligations; and (C) authorizing the Debtors to honor workers' compensation obligations. In support of the Motion, the Debtors rely on the Declaration of Mark G. Meikle in Support of Chapter 11 Petitions and First Day Pleadings, filed concurrently herewith. In further support of the Motion, the Debtors respectfully state as follows:

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers): Triple Crown Media, Inc. (2824), Triple Crown Media, LLC (2824), BR Acquisition Corp. (8679), BR Holding, Inc. (7599), Datasouth Computer Corporation (9261), Gray Publishing, LLC (7061), and Capital Sports Properties, Inc. (6084). The service address for all of the Debtors for purposes of these chapter 11 cases is: 725 Old Norcross Road, Lawrenceville, GA 30045.

## JURISDICTION

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

2.      The statutory and legal predicates for the relief sought herein are Sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of chapter 11 of the United States Code, 11 U.S.C. §§ 101 et. seq. (the "Bankruptcy Code"), and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

3.      The Debtors commenced these cases by the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 14, 2009 (the "Commencement Date"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their affairs as debtors in possession. As of the date hereof, no creditors committee, trustee or examiner has been appointed in any of these chapter 11 cases.

4.      The Debtors operate a newspaper publishing business in certain communities in the Atlanta, Georgia metropolitan area and western Georgia. The Debtors own and operate six daily newspapers and one weekly newspaper. These community newspapers focus on local content, including coverage of local youth, high school and college sports, local business, politics, entertainment and cultural news. As community newspapers with locally driven content, the Debtors are able to differentiate themselves from other forms of media by providing a cost-effective medium for local advertisers to target their customers.

5.      The Debtors have entered into a Restructuring Support Agreement ("RSA") with holders of more than 80% of the Debtors' obligations under their second lien credit facility (the "Second Lien Credit Facility"). The RSA contemplates a comprehensive financial restructuring

of the Debtors pursuant to the terms set forth in the Joint Plan of Reorganization (the "Plan") filed concurrently herewith. The Plan contemplates, among other things, the conversion of a portion of the Second Lien Credit Facility to equity in the Reorganized Debtors. Additionally, the Debtors reached an agreement with Wachovia Bank, National Association ("Wachovia" or the "First Lien Administrative Agent"), the collateral and administrative agent under the Debtors' first lien credit facility (the "First Lien Credit Facility") and Wilmington Trust ("Wilmington" or the "Second Lien Administrative Agent" as the collateral and administrative agent under the Second Lien Credit Facility for the consensual use of Cash Collateral, subject to certain terms and conditions, during the pendency of these chapter 11 cases.

6.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 filings are contained in the Declaration of Mark G. Meikle in Support of First Day Motions and Applications (the "Meikle Declaration"), filed contemporaneously herewith.

## THE EMPLOYEES

7.     The Debtors have a current workforce of approximately 330 employees (each an "Employee" and collectively, the "Employees"), of which 288 are full time and 42 are part time. In addition, the Debtors employ approximately 36 temporary workers and 525 independent contractors, primarily as carriers and correspondents.[2] The Employees possess the institutional knowledge, experience and skills necessary to support the Debtors' business operations during the chapter 11 reorganization process. Because of the Debtors' need for the continued commitment of the Employees, the Debtors are requesting the relief herein to minimize any hardships to the Employees resulting from the commencement of the Debtors' chapter 11 cases.

---

[2] The definition of Employees is broad and includes, where appropriate, references to the temporary workers and independent contractors.

The Debtors must take all necessary steps to retain their Employees and bolster employee morale in order to succeed in their efforts to preserve and maximize the value of their estates.

8. Accordingly, by this Motion, the Debtors seek authority to pay and honor their prepetition obligations, pay Unpaid Compensation (as defined below), pay employee withholding taxes and employer taxes (including but not limited to federal, state, employment, and other payroll and withholding taxes), honor vacation and personal time off obligations, continue their workers' compensation programs, maintain employee benefits, continue garnishment and payroll deductions, reimburse Employees' business expenses, and honor miscellaneous Employee benefits that the Debtors have traditionally provided in the ordinary course of business (all such obligations to the Employees collectively, the "Employee Obligations").

## SUMMARY OF EMPLOYEE OBLIGATIONS

### A. Wages, Salaries and Other Compensation

9. As noted *supra,* the Debtors employ approximately 330 full-time Employees in the communities in which they operate. The Debtors coordinate their payroll through their payroll processor, Paycom. For payroll purposes, Employees are classified as either "exempt" or "nonexempt." Non-exempt Employees are paid an hourly rate of pay and receive overtime payments of one and one-half (1 1/2) times their regularly hourly rate hours over 40 worked during the work week. Exempt Employees are paid a set salary or commission and do not receive overtime pay.

10. Employees are paid on a bi-weekly basis and are generally paid one week in arrears.[3] The average bi-weekly payroll for the Debtors' Employees – exclusive of sales

---

[3] The most recent completed pay period began on August 17, 2009 and concluded on August 31, 2009, with payments made to Employees on September 7, 2009. The current pay period will end on September 13, 2009, with payment on September 21, 2009.

commissions – is approximately $382,000. The Debtors also pay certain of their Employees commissions based upon sales of advertising space. The Debtors estimate that the total outstanding amount in wages, salaries and commissions as of the Commencement Date is approximately $455,000.

11.     Additionally, the Debtors currently utilize approximately 36 temporary employees through various temporary employment agencies (collectively, the "Temporary Employees"). The Debtors estimate that the total amount of outstanding compensation owed to the Temporary Employees, as of the Commencement Date, is approximately $25,000.

12.     The Debtors also utilize approximately 525 newspaper carriers, photographers and writers (the "Independent Contractors") which are critical to the Debtors' business operations. The Debtors estimate that the total amount of outstanding compensation owed to the Independent Contractors, as of the Commencement Date, is approximately $320,000.[4]

13.     By this Motion, the Debtors seek an order authorizing, but not directing them, to pay all outstanding wages, salaries and other compensation owed to the Employees, Temporary Employees and Independent Contractors as of the Commencement Date, aggregating approximately $800,000.

**B.      Vacation, Sick, Holiday, and other Leave**

14.     Full-time Employees are entitled to vacation benefits after six months of continuous full time employment (the "Vacation Policy"). In the first year of employment, Employees are entitled to five days of vacation time. As Employees advance in seniority, they may earn as much as 20 days of vacation. Employees earn vacation time on their employment

---

[4] The Independent Contractors are paid at various times, depending on the newspaper, however the majority are paid each Tuesday for the prior week. They are generally paid by check and as a result, certain Independent Contractors likely have prepetition payroll checks that remain outstanding. By this Motion, the Debtor seeks authority for the Debtors' banks to honor all payroll checks issued to Independent Contractors, regardless of when such checks were issued.

anniversary date and have until their employment anniversary date in the following year to take their earned vacation. Unused vacation time cannot be carried over from year to year nor converted to cash if not used, except in the event of termination of employment. The Debtors estimate that the total amount of outstanding vacation time as of the Commencement Date is $236,250.

15.     Full-time Employees are entitled to sick days to provide salary continuation for limited periods of absence due to illness or injury that prevents the Employee from performing normal tasks (the "Sick Leave Policy"). Active full-time Employees are eligible for sick leave benefits on the first day of the month following ninety days of continuous employment. Once eligible, Employees are entitled to three days in their first two years of service, and six days thereafter. Sick time is made available to all Employees at the beginning of the calendar year and cannot be carried over from year to year. Prior to December 31, 2005, however, Employees were permitted to "bank" sick time and certain Employees do have accrued time that they are still eligible to use. As of the Commencement Date, the Debtors estimate that the total value of sick time available to Employees is $220,640, with $102,210 of the total being for banked sick time.

16.     Full-time Employees have the following paid holidays each year: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day. Additionally, there are three floating holidays, two of which can be taken by the Employee in their discretion, with approval of their supervisor, and one of which is determined by the manager, for those working in that department (the "Holiday Policy"). Employees must work on the workdays immediately before and after the holiday. If a designated holiday occurs on a Saturday or Sunday, another day is observed, normally the Friday before or the Monday after the

holiday. Holidays are not counted as hours worked for the purpose of computing overtime. The Debtors estimate that the total annual cost for holiday pay is approximately $210,000.

17. The Debtors allow Employees paid time off in the event of a death in the family (the "Bereavement Policy"). Under the Bereavement Policy, Employees are entitled to three days of paid leave in the event of the death of an immediate family member and one day for other relatives. Additionally, supervisors may grant longer periods of personal leave, without pay. The Debtors estimate the total annual cost for bereavement days is approximately $9,000.

18. In the event that an Employee is summoned to jury duty or subpoenaed to appear in court as a witness, the Employee is entitled to continue receiving their regular compensation (less any amounts received from the court) during the time they are absent from work, up to a maximum of five (5) working days (the "Jury and Witness Policy"). The Debtors estimate that the total annual cost for these days is approximately $1,000.

19. When scheduling does not permit, time off with pay will be granted up to a maximum of two hours to allow Employees to vote on election day (the "Voting Policy"). The Debtors believe the expense associated with the Voting Policy is *de minimus*.

20. The Debtors grant a military leave of absence to Employees who serve in the armed forces, the National Guard, or the commissioned corps of the Public Health Service (the "Military Leave Policy"). Exempt Employees who are absent for less than one week will continue to receive their pay for the time missed. All other military leave is unpaid. While on military leave, Employees may also be eligible to continue to receive health and other benefits. The Debtors estimate that the total annual cost for the Military Leave Policy is approximately $500.

21. The Debtors believe these paid time off policies are essential to maintaining Employee morale and the commitment of valued Employees during these chapter 11 cases.

Therefore, by this Motion, the Debtors seek an order authorizing, but not directing them, to honor all liabilities to their Employees with respect to the Vacation Policy, Sick Leave Policy, Holiday Policy, Bereavement Policy, Jury and Witness Policy, Military Leave Policy and other benefits that arose prior to the Commencement Date and to continue their prepetition policies with respect to same going forward. The Debtors anticipate that their Employees will utilize any accrued vacation, sick days, holidays and other such leave in the ordinary course, without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.

## C.    Insurance Benefits

22.    In the ordinary course of its business, the Debtors provide medical, prescription drug, dental and vision insurance to their eligible Employees (collectively, the "Health Benefits"). The Debtors utilize group plans with Humana for the medical and dental plans and VSP for vision. Eligible Employees are also entitled to participate in the Debtors' short-term disability, long-term disability and life insurance programs (collectively with the Health Benefits, the "Insurance Benefits").

### (i)    Medical, Prescription Drug, Dental, and Vision Programs

23.    Full-time Employees, who have been employed for 90 calendar days, are eligible to receive Health Benefits. Receipt of the medical, dental and vision benefits requires a participating full-time Employee to fund 65% of the applicable insurance premium amount via deductions from their paycheck with the remaining 35% of the premium being provided by the Debtors. The medical plan (the "Medical Plan"), which includes a prescription drug program, is provided through Humana and grants eligible Employees with multiple options relating to deductibles, co-pays, and general services based on the Employee's preference. The dental plan (the "Dental Plan"), offered through Humana, and the vision plan (the "Vision Plan"), offered through VSP, provide a single tier of benefits depending upon an Employee's use of a doctor

within, or outside of, the plan's preferred network. The Debtors' average monthly cost over a twelve (12) month period for providing the Health Benefits is approximately $965,000.

24.     As of the Commencement Date, the Debtors believe they are current and that they do not have any outstanding unpaid amount for the Health Benefits.

**(ii)     COBRA Coverage**

25.     For similar reasons, the Debtors seek to continue to perform their obligations under section 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") ( See 26 U.S.C. § 4980B) with respect to former employees. The premiums for the COBRA coverage are paid solely by the participating employee. The Program Administrator, Paycom, collects the premiums from the former employees and reconciles the amount with the Debtors' other Health Plan claim/payment activity. On a monthly basis Paycom collects in the aggregate, approximately $1,443.70 from the former employees enrolled in the COBRA program.

**(iii)     Life and Disability Insurance Programs**

26.     The Debtors provide all full-time Employees short-term disability coverage the first of the month following one full year of employment (the "Short Term Disability Insurance"). Eligible non-commissioned Employees with less than two years of service are entitled to receive 50% of pay and Employees with two or more years of service are entitled to receive up to 75% of pay, for up to 90 days for any qualified short term disability. Commissioned Employees are eligible for 50% and 75% of base pay plus average commissions based on the previous twelve months, respectively. The Short Term Disability Insurance is fully funded by the Debtors and is provided through Principal Financial. The annual cost to the Debtors is approximately $16,000. As of the Commencement Date, the Debtors believe the policies were paid current and there are no amounts outstanding.

27.     In addition to the Short Term Disability Insurance, the Debtors provide all eligible full-time Employees long-term disability coverage to protect from extended illnesses, injuries, or other serious health conditions that require leave from work for an extended period of time (the "Long-Term Disability Insurance"). Long-term disability benefits are payable at 60% of the Employee's regular income. To be eligible for Long-Term Disability Insurance, the Employee must be deemed disabled for a period of 90 days. The annual cost to the Debtors is approximately $33,000. The Debtors believe all premiums are paid through the Commencement Date.

28.     The Debtors offer their eligible full-time Employees and their dependents with certain life insurance and accidental death and dismemberment coverage (collectively, the "Life Insurance"). Eligible Employees are provided Life Insurance at no cost to the Employees through Principal Financial. Eligible Employees are also given the opportunity to purchase supplemental life insurance (the "Supplemental Life Insurance") coverage through Principal Financial, with 100% of the cost funded by each participating Employee. Full-time Employees are eligible to receive Life Insurance and enroll in Supplemental Life Insurance for themselves and their dependents. As of the Commencement Date, the Debtors believe that all amounts are paid current and that they do not have any outstanding unpaid amount for the Life Insurance, including for the Employee contributions for the Supplemental Life Insurance coverage.

29.     By this Motion, the Debtors seek an order authorizing, but not directing them, to pay all amounts due and owing as of the Commencement Date with respect to the Health Benefits, COBRA Benefits, Short-Term Disability Insurance, Long-Term Disability Insurance, Life Insurance and Supplemental Life Insurance and to continue such benefits post-petition.

**D.    Employee Assistance Program**

30.    The Debtors provide all full time Employees an Employee Assistance Program for solutions and help dealing with life's challenges (the "EAP Program"). The EAP Program is provided through Humana and Principal Financial and administered by Magellan Health Services. The EAP program provides counselors 24 hours a day, seven days a week for consultation. As this is provided through Humana and Principal Financial, it is funded through other programs and does not cost additional money for the Debtors. The Debtors request authority, but not direction, to continue the EAP Program.

**E.    Flexible Spending Account**

31.    The Debtors provide their Employees with a flexible spending account, pursuant to which some Employees maintain flexible spending account plans for healthcare and dependent care (the "Flexible Spending Plan"). Under the Flexible Spending Plan, Employees have amounts withheld from their paychecks on a pre-tax basis and placed into personal accounts. The funds can subsequently be used by the Employees for their healthcare and dependent care expenses such as deductible amounts. When an Employee incurs an eligible expense during the year, they present a receipt of the expense to Flexbank, which then reimburses the Employees from the Employee's account. Unused money in an Employee's Account is non-refundable to the individual.

32.    As of the Commencement Date, the Debtors' are in possession of approximately $3,300 of Employee contributions. The Debtors request the authority (but not the direction) to continue the Flexible Spending Plan in the ordinary course of business.

**F.    Savings Plan**

33.    The Debtors have a defined savings plan for its Employees which is qualified under section 401(k) of the Internal Revenue Code (the "Savings Plan"). The Savings Plan is

administered by Great West Retirement Services. Employees may enroll in the Savings Plan the first of the month following one year of continuous full time employment and attainment of age 21. Pursuant to the Savings Plan, elected amounts are deducted from each participating Employee's payroll check and transferred to the trust for the Savings Plan. There is currently no employer funded contribution (e.g. match or profit sharing contribution) provided under the Savings Plan. As of the Commencement Date, the Debtors have forwarded all amounts due to Great West Retirement Services. The payment for the recently completed payroll is due September 21, 2009 and the amount is included within the Employee payroll.

34.     By this Motion, the Debtors seek an order authorizing, but not directing, to pay all amounts owing as of the Commencement Date with respect to the Savings Plan and to continue performing under the Savings Plan in the ordinary course of business.

**G.     Reimbursable Business Expenses**

35.     As is customary with most businesses, the Debtors reimburse their Employees who incur and pay a variety of approved business-related expenses, in the ordinary course of performing their duties (collectively, the "Employee Expense Obligations"). The Employees initially incur and pay such expenses and are subsequently reimbursed by the Debtors after submission and approval of expense reimbursement requests.

36.     Because a significant lag time may occur between the time such expenses are incurred and the time an expense reimbursement request is submitted, it is difficult to determine with precision the aggregate outstanding amount of such Employee Expense Obligations. On average, the Employee Expense Obligations are approximately $35,000 per month.

37.     It would be patently inequitable to require Employees to personally bear any expenses that they incurred in furtherance of their responsibilities to the Debtors. Accordingly, the Debtors request authority, in their discretion and in the exercise of their business judgment,

to continue to honor all of their Employee Expense Obligations in the ordinary course of business, regardless of when such obligations arose.

**H.     Prepetition Processing Costs**

38.     The Debtors also request authorization to pay the various costs incident to maintaining, or paying third parties to maintain and provide, record keeping and other administrative services relating to the various Employee benefits programs identified in this Motion that may be outstanding as of the Commencement Date (the "Prepetition Processing Costs"). The Debtors believe that as of the Commencement Date approximately $3,500 is owed with respect to Prepetition Processing Costs.

**I.     Workers' Compensation Obligations**

39.     Under the laws of the various states in which the Debtors operate, the Debtors are required to maintain workers' compensation liability insurance and to provide the Employees with workers' compensation coverage for claims arising from or related to their employment (the "Workers' Compensation Obligations"). The Debtors provide workers' compensation benefits to the Employees through an insured program with Georgia Casualty & Surety (the "Workers' Compensation Policy").

40.     Failure to maintain workers' compensation insurance in the various states in which the Debtors conduct business could result in the institution of administrative or legal proceedings and material fines against the Debtors and their officers and directors. The Debtors therefore seek authority to continue paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all outstanding amounts related to Workers' Compensation Obligations that arose prior to the Commencement Date, including, without limitation, any payments for workers' compensation claims, premiums and fees owed for administrative costs

and other amounts required in connection with the Debtors' workers' compensation program, as such amounts become due in the ordinary course of the Debtors' business.

**J.     Employee Payroll Garnishments/Other Payroll Deductions**

41.     The Debtors deduct from their Employees' paychecks certain taxes, such as payroll and social security taxes, required to be withheld by certain federal, state and local taxing authorities (the "Payroll Tax Obligations"). The Debtors forward certain of these withheld amounts, as well as the necessary employer contributions, to Paycom, which forwards the amounts to the appropriate governmental authorities, or alternatively, the Debtors make direct payments to certain governmental authorities. By this Motion, the Debtors seek authority to forward any Payroll Tax Obligations not forwarded as of the Commencement Date and to continue to forward any future Payroll Tax Obligations.

42.     Frequently, the Debtors are presented with garnishment or child support orders requiring the withholding of Employee wages to satisfy such obligations. Payments of these obligations are made from amounts otherwise payable to the Employees and are not an incremental cost obligation of the Debtors' estates. The Debtors seek authority to continue making such deductions and to pay over such amounts to third parties as requested or required in the ordinary course.

**K.     Miscellaneous Benefits**

43.     The Debtors may discover other *de minimis* prepetition obligations that are owed with respect to the Employees (the "Miscellaneous Benefits"). The Debtors request authority to continue to honor these discounts in the ordinary course. The Debtors believe that honoring their commitments under these Miscellaneous Benefits programs is warranted, at a minimum, by public relations and Employee morale considerations. Accordingly, the Debtors request authority

to continue making payments in the ordinary course of their business on account of Miscellaneous Benefits.

## **RELIEF REQUESTED AND BASIS THEREFORE**

44.     To minimize the personal hardship the Employees will suffer in connection with the filing of these cases. the Debtors request entry of an order: (i) authorizing (but not directing) the Debtors to pay, in their sole discretion, the Employee Obligations as described in this Motion and all costs incident thereto, (ii) authorizing (but not directing) the Debtors to continue to honor their practices, programs and policies with respect to the authorization (but not direction) to pay the Employee Obligations that become due and owing during the pendency of these cases, and (iii) authorizing and directing the Banks (as defined below) to receive, process, honor and pay all checks on account of Employee Obligations whether presented before or after the Commencement Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

45.     Pursuant to section 507(a)(4) of the Bankruptcy Code, each Employee may be granted a priority claim for:

> allowed unsecured claims, but only to the extent of $10,950 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for
>
> (A)     wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual; or
>
> (B)     sales commissions earned by an individual or by a corporation with only 1 employee, acting as an independent contractor in the sale of goods or services for the debtor in the ordinary course of the debtor's business if, and only if, during the 12 months preceding that date, at least 75 percent of the amount that the individual or corporation earned by acting as an independent contractor in the sale of goods or services was earned from the debtor.

11 U.S.C. § 507(a)(4).

46.     Likewise, under §507(a)(5) of the Bankruptcy Code, employees may ultimately be granted a priority claim for:

> allowed unsecured claims for contributions to an employee benefit plan
>
> (A)     arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
>
> (B)     for each such plan, to the extent of .
>
>> (i)     the number of employees covered by each such plan multiplied by $10,950.00; less
>>
>> (ii)     the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan.

11 U.S.C. § 507(a)(5).

47.     The Debtors believe that the prepetition Employee Obligations that they seek to pay are entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code and, with limited exceptions as detailed below, do not exceed $10,950 for any individual Employee. The Debtors would therefore be required to pay these claims in full in order to confirm a Chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for wages, salaries, and commissions, and certain allowed unsecured claims for contributions to an employee benefit plan). Thus, granting the relief requested herein would only affect the timing, and not the amount, of the payment of the Employee Obligations to the extent that they constitute priority claims.

48.     As the Debtors are very near the end of a payroll cycle, there are ten Employees whose total amount of Employer Obligations, including wages, commissions, sick leave, and

vacation time exceed the $10,950 cap.[5] The Debtors understand that any payments above the statutory cap are general unsecured claims of the Debtors (as such, the "Excepted Payments"). Therefore, the Debtors further request authority to pay the Excepted Payments in the ordinary course of business. The Debtors are seeking relief to pay general unsecured claims in the ordinary course of business pursuant to a motion before the Court filed concurrently herewith (the "General Unsecured Creditors Motion"). The Debtors believe the General Unsecured Creditors Motion provides additional support for the payment of the Excepted Payments, however, out of an abundance of caution, the Debtors seek further order of the Court, pursuant to this Motion, to pay the Excepted Payments.

49.     Additionally, the failure to pay Payroll Tax Obligations could result in tax liabilities and penalties for both the Employees and the Debtors, and potentially to the Debtors' directors and officers. Likewise, the failure to transmit garnishments and other similar deductions can cause hardship to certain Employees and an administrative burden for the Debtors. Indeed, if the Debtors were to be prohibited from transmitting such deductions, the Debtors would expect inquiries from garnishors regarding the Debtors' failure to submit, among other things, child support and alimony payments that are not the Debtors' property, but, rather, have been withheld from Employees' paychecks on such parties' behalf. Further, if the Debtors cannot remit these amounts, the Employees may face legal action due to the Debtors' failure to submit such payments.

50.     Moreover, maintaining the Debtors' Workers' Compensation Policy is indisputably justified because applicable state law mandates this coverage. Furthermore, with respect to the Workers' Compensation Obligations, the risk that eligible claimants will not

---

[5] When excluding sick time and vacation time, only one Employee exceeds the cap with just over $11,000 due between wages and commission.

receive timely payments with respect to employment-related injuries could have a devastating effect on the financial well-being and morale of the Employees and their willingness to remain in the Debtors' employ.

51. Other than as described in this Motion, the Debtors do not by this Motion seek to alter their compensation, incentive, vacation, and other benefit policies at this time. This Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with those prepetition policies to the extent that, without the benefit of an order approving this Motion, such payments would be inconsistent with the Bankruptcy Code.

52. The Debtors submit that, consistent with Bankruptcy Rule 6003(b), immediate entry of an order approving payment of the Employee Obligations is necessary to avoid immediate and irreparable harm to the Debtors and their estates, in addition to the Employees. The vast majority of the Employees rely exclusively on their full compensation, benefits and reimbursement of their expenses to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to pay the unpaid Employee Obligations. The Debtors believe that if they are unable to honor such obligations. Employee morale and loyalty will be jeopardized at a time when such support is critical.

53. Preservation and maximization of the value of the Debtors' estates depends upon a stable work force. Thus, any significant number of Employee departures or deterioration in morale at this time will substantially and adversely impact the Debtors' business operations and their Chapter 11 efforts and result in immediate and irreparable harm to the estates and their creditors. There is a real, immediate risk that if the Debtors are not authorized to continue to satisfy Employee Obligations in the ordinary course, Employees would no longer support and maintain the Debtors' operations, thereby jeopardizing the value of the Debtors' assets.

Consequently, it is critical that the Debtors continue their ordinary course personnel policies, programs and procedures that were in effect prior to the Commencement Date, except as otherwise set forth herein, for all of their Employees. Cause therefore exists for the Court to grant the relief requested herein immediately, as permitted by Bankruptcy Rule 6003.

54.     Courts in this District have approved the payment of prepetition claims of employees for wages, salaries, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate the Chapter 11 process. *See, e.g.. in re ProxyMed Transaction Services, Inc.,* Case No. 08-11551 (Bankr. D. Del. July 24, 2008) (BJS) (authorizing the payment of prepetition wages, salaries and other compensation); *In re National Dry Cleaners Inc.,* Case No. 08-11382 (Bankr. D. Del. July 7, 2008) (CSS) (same); *In re Powermate Holding Corp.,* Case No. 08-10498 (Bankr. D. Del. March 18, 2008) (KG) (same); *In re Buffets Holdings, Inc.,* Case No. 08-10141 (Bankr. D. Del. January 23, 2008) (PJW); *In re Sea Containers Ltd.,* Case No. 06-11156 (Banks. D. Del. October 17, 2006) (KJC) (same); *In re Pliant Corporation,* Case No. 06-10001 (Bankr. D. Del. January 31, 2006) (PJW)(same).

55.     Authorization to pay any amounts under this Motion shall not be deemed to constitute post-petition assumption or adoption of any contract, program or policy pursuant to section 365 of the Bankruptcy Code. The Debtors are in the process of reviewing these matters and reserve all their rights under the Bankruptcy Code with respect thereto. Moreover, authorization to pay all amounts under this Motion shall not affect the Debtors' right to contest the amount or validity of any Employee Obligations, including without limitation the Payroll Tax Obligations that may be due to any taxing authority.

56.     Accordingly, as authorized by sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors seek authority to pay the Employee Obligations that become due and owing during the pendency of these cases and to continue at this time their practices, programs and

policies with respect to the Employees, as such practices, programs and policies were in effect as of the Commencement Date. The Debtors submit that the relief requested herein is essential and critical to their ability to maximize value for their creditors.

**APPLICABLE BANKS SHOULD BE AUTHORIZED TO HONOR
AND PAY CHECKS ISSUED AND MAKE OTHER TRANSFERS
TO PAY THE PRE-PETITION EMPLOYEE OBLIGATIONS**

57.     The Debtors further request that the Court authorize and direct applicable banks and other financial institutions (collectively, the "Banks") to honor and pay all prepetition and post-petition checks issued or to be issued, and fund transfers requested or to be requested, by the Debtors on account of the Employee Obligations that were not honored or paid as of the Commencement Date. The Debtors also seek authority to issue new post-petition checks, or effect new fund transfers, on account of the Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

58.     As a result of the commencement of the Debtors' chapter 11 cases, and in the absence of an order of the Court providing otherwise, the Debtors' checks or other transfers on account of the Employee Obligations may be dishonored or rejected by the Banks. The Debtors represent that each of these checks or transfers can be identified as relating directly to payment of the Employee Obligations. Accordingly, the Debtors believe that prepetition checks and transfers other than those for Employee Obligations will not be honored inadvertently.

59.     The Debtors hereby request that all Banks be authorized and directed to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors related to the Employee Obligations, whether such checks were presented or fund transfer requests were submitted prior to or after the Commencement Date, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

60.     Finally, the Debtors' request that, to the extent applicable, the stay provisions set forth in Bankruptcy Rule 6004(h) should be waived and that the relief requested herein be effective immediately.

## NOTICE

61.     Notice of this Motion has been given to: (i) Counsel to the Debtors, (ii) Counsel to the First Lien Administrative Agent, (iii) Counsel to the Second Lien Administrative Agent, (iv) the U.S. Trustee for the District of Delaware, and (v) the debtors consolidated list of top 30 unsecured creditors.  As this Motion is seeking first day relief, notice of this Motion and any order entered herein will be served on all parties required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

62.     The Debtors have not previously sought the relief requested herein from this or any other Court.

WHEREFORE, the Debtors request entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein and such other and further relief as is just and proper.

Dated: September 14, 2009
      Wilmington, Delaware

*/s/ Gregory T. Donilon*
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Robert J. Dehney (DE Bar No. 3578)
Gregory T. Donilon (DE Bar No. 4244)
1201 N. Market Street
PO Box 1347
Wilmington, DE 19899-1347
Telephone: 302-658-9200
Facsimile: 302-658-3989

-and-

DINSMORE & SHOHL LLP
Tim J. Robinson, Esq. (OH Bar #0046668)
Patrick D. Burns, Esq. (OH Bar #0081111)
255 E. 5th St., Ste. 1900
Cincinnati, OH 45202
Telephone: 513-977-8200
Facsimile: 513-977-8141

Proposed Counsel to Debtors
and Debtors In Possession