THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN.  ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN OF REORGANIZATION.  THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.  **THE DEBTORS CONTINUE TO REVIEW THIS DISCLOSURE STATEMENT AND RESERVE THE RIGHT TO MAKE MODIFICATIONS AND ADDITIONAL DISCLOSURES PRIOR TO THE DISCLOSURE STATEMENT APPROVAL HEARING.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**TRIPLE CROWN MEDIA, INC., et al.**[1]<br><br>Debtors. | **Chapter 11**<br><br>**Case No.  09-_____**<br><br>**Jointly Administered** |

## DEBTORS' DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

| | |
|---|---|
| Robert J. Dehney<br>Gregory T. Donilon<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>1201 N. Market Street<br>PO Box 1347<br>Wilmington, DE  19899-1347<br>(302) 658-9200 | Tim J. Robinson<br>Patrick D. Burns<br>DINSMORE & SHOHL LLP<br>Attorneys for the Debtors<br>255 East Fifth Street<br>Cincinnati, OH  45202<br>(513) 977-8200 |

Dated:  Wilmington, DE
 _____, 2009

---

[1] The Debtors are the following entities (followed by the last four digits of their tax identification numbers):  Triple Crown Media, Inc. (2824), Triple Crown Media, LLC (2824), BR Acquisition Corp. (8679), BR Holding, Inc. (7599), Datasouth Computer Corporation (9261), Gray Publishing, LLC (7061), and Capital Sports Properties, Inc. (6084).  The service address for all of the Debtors for purposes of these chapter 11 cases is:  725 Old Norcross Road, Lawrenceville, GA 30045.

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| | A. Holders Of Claims Entitled To Vote | 2 |
| | B. Voting Procedures | 2 |
| | C. Confirmation Hearing | 3 |
| II. | OVERVIEW OF THE PLAN | 4 |
| III. | OVERVIEW OF CHAPTER 11 | 9 |
| IV. | COMPANY BACKGROUND | 9 |
| | A. The Debtors' Businesses | 9 |
| | B. The Debtors' Pre Petition Capital Structure | Error! Bookmark not defined. |
| V. | EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES | 14 |
| VI. | THE CHAPTER 11 CASES | 14 |
| | A. Significant "First Day" Motions | 14 |
| | B. DIP Credit Facility | 15 |
| | C. The Excluded Portion | 15 |
| VII. | SALE OF THE DEBTORS' EQUITY PURSUANT TO THE PLAN | 15 |
| | A. Bidding Procedures | Error! Bookmark not defined. |
| VIII. | SUMMARY OF THE PLAN | 16 |
| | A. Introduction | 17 |
| | B. Classification and Treatment of Administrative Claims, Claims and Equity Interests under the Plan | 17 |
| | C. Voting on the Plan | 24 |
| | D. Distributions under the Plan | 24 |

E.      Objections to and Resolution of Claims ................................................. 26

F.      Estimation ............................................................................................... 26

G.      Claims of the Indenture Trustee ..............................Error! Bookmark not defined.

H.      Cancellation and Surrender of Existing Securities and Agreements ............. 27

I.      Issuance of New Securities ..................................................................... 27

J.      Provisions Regarding Corporate Governance .................................................. 28

K.      Deemed Consolidation for Distribution Purposes ............................................. 29

L.      Effect of Confirmation of the Plan ..................................................... 30

M.      Retention of Jurisdiction ....................................................................... 35

N.      Miscellaneous Provisions ...................................................................... 35

O.      Executory Contracts and Unexpired Leases .................................................. 38

P.      Confirmation Precedent to Confirmation ........................................................ 40


IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............... 43

A.      Tax Consequences to Debtors ............................................................. 44

B.      Tax Consequences to Prevailing Purchaser ..........Error! Bookmark not defined.

C.      Tax Consequences to Holders of Certain Allowed Claims ............................ 48

D.      Limitation on Use of Capital Losses ................................................... 50

E.      Information Reporting and Backup Withholding ......................................... 51


X. CONFIRMATION PROCEDURES .................................................................. 51

A.      Confirmation Hearing ........................................................................... 51

B.      Statutory Requirements For Confirmation Of The Plan ............................... 51

**XI. PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ................................................................ 56

    **A.**    General ................................................................................................ 56

    **B.**    Bankruptcy Law Considerations ..................................................... 58

    **C.**    Transaction Risks ............................................................................. 59

    **D.**    Business Factors and Competitive Conditions ................................ 60

**XII. CONCLUSION AND RECOMMENDATIONS** ............................................. 62

<u>DISCLAIMER</u>

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, CERTAIN OTHER DOCUMENTS AND CERTAIN FINANCIAL INFORMATION OF THE DEBTORS. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE; HOWEVER, YOU SHOULD READ THE PLAN IN ITS ENTIRETY. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR THE OTHER DOCUMENTS OR FINANCIAL INFORMATION TO BE INCORPORATED HEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF INFORMING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, BUT NOT LIMITED TO, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON NOR INTERPRETED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, HOLDERS SHOULD CONSTRUE THIS

DISCLOSURE STATEMENT AS A STATEMENT MADE IN FURTHERANCE OF SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

SEE ARTICLE XI OF THIS DISCLOSURE STATEMENT ENTITLED "PLAN-RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMING AND CONSUMMATING THE PLAN" FOR A DISCUSSION OF VARIOUS FACTORS TO BE CONSIDERED IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. CLAIM HOLDERS SHOULD NOT RELY UPON ANY INFORMATION, REPRESENTATIONS OR OTHER INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTORS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE PLAN CONSTITUTES A MOTION SEEKING ENTRY OF AN ORDER SUBSTANTIVELY CONSOLIDATING THE CHAPTER 11 CASES AS DESCRIBED IN THE PLAN.

CAPITALIZED TERMS NOT DEFINED HEREIN SHALL HAVE THE MEANING ASCRIBED TO THEM IN THE PLAN OR OTHER RELEVANT DOCUMENT AS SO INDICATED.

# I.
# INTRODUCTION

Triple Crown Media, Inc., Triple Crown Media, LLC, BR Acquisition Corp., BR Holding, Inc., DataSouth Computer Corporation, Gray Publishing, LLC, and Capital Sports Properties, Inc. (collectively, the "Debtors" or the "Company") submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of claims against the Debtors in connection with (i) the solicitation of acceptances of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated [_____, 2009], as the same may be amended (the "Plan"), filed by the Debtors with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for [_____, 2009] commencing at [_____ _.m. prevailing Eastern Time]. The Plan provides for the distribution of New Common Stock to holders of Allowed Second Lien Credit Facility Claims, and, upon the support of the Plan by Class 11, holders of Preferred Stock Equity Interests.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

    a. The Plan (Exhibit A);

    b. Order of the Bankruptcy Court dated [_____, 2009] (the "Disclosure Statement Order"), which, among other things, approves this Disclosure Statement and establishes certain procedures with respect to solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims and Interests that are entitled to vote to accept or reject the Plan.

On [_____, 2009], after notice and a hearing, the Bankruptcy Court signed and entered the Disclosure Statement Order approving the Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors entitled to vote on the Plan to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, a copy of which is annexed hereto as Exhibit C, sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim or Equity Interest entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting

purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A.    HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a proposed chapter 11 plan are entitled to vote to accept or reject such plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests will receive no recovery under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. For information regarding the various classes of claims and their treatment under the Plan, see Section VIII. B. of the Disclosure Statement.

Pursuant to the Plan, holders of Allowed Claims in Classes 1, 2, 4, 5, 6 and 7 and Equity Interests in Class 9 will either receive distributions equal to the total amount of their Claims or retain their Equity Interests, as applicable, will be Unimpaired and will be deemed to have accepted the Plan. Holders of Allowed Claims in Class 7 will be unimpaired as the First Lien Credit Facility will be fully reinstated. As a result, holders of Class 7 Claims will be deemed to have accepted the Plan. Holders of Allowed Claims in Classes 3 and 11 of the Plan will be entitled to partial distribution on account of their Claims and are Impaired. As a result, holders of Allowed Claims in Classes 3 and 11 are entitled to vote to accept or reject the Plan. Holders of Allowed Claims in Class 8 and Equity Interests in Class 10 of the Plan, consisting of holders of Subordinated Securities Claims and Common Stock Equity Interests of Non-Surviving Debtors and TCMI, respectively, will not receive any distributions under the Plan. As a result, holders of Allowed Claims in Classes 8 and Equity Interests in Class 10 are conclusively presumed to have rejected the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that casts ballots for acceptance or rejection of a proposed plan. For a more detailed description of the requirements for confirmation of the Plan see Section X. of the Disclosure Statement.

## B.    VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed herewith for the purpose of voting on the Plan. If you hold Claims and/or Equity Interests in more than one Class and you are entitled to vote Claims and/or Equity Interests in more than one Class, you will receive separate Ballots for each Class of Claims that you hold, which must be used for each separate Class of Claims and/or Equity Interests. Please vote and return your Ballot(s) as directed on the Ballots to Kurtzman Carson Consultants ("KCC"), the Debtors' claims, noticing and balloting agent (the "Balloting Agent"), at the addresses provided on your Ballot.

1687876_1

DO NOT RETURN ANY NOTES OR SECURITIES WITH YOUR BALLOT.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> BY NO LATER THAN 4:00 P.M., PREVAILING EASTERN TIME ON [_____, 2009]. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN [AND, UNLESS OTHERWISE ELECTED ON THE BALLOT, AN ACCEPTANCE OF THE RELEASES CONTAINED WITHIN THE PLAN]. ANY EXECUTED BALLOT RECEIVED THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN [AND AN ACCEPTANCE OF THE RELEASES CONTAINED WITHIN THE PLAN.] ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED, IN THE DISCRETION OF THE DEBTORS.

Any Claim or Equity Interest in an Impaired Class as to which an objection or request for estimation is pending or which is scheduled by the Debtors as unliquidated, disputed or contingent and for which no proof of claim has been filed is not entitled to vote unless the holder of such Claim or Equity Interest has obtained an order of the Bankruptcy Court temporarily allowing such Claim or Equity Interest for the purposes of voting on the Plan.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set [_____, 2009] as the Record Date for voting on the Plan. Accordingly, only holders of record as of [_____, 2009], that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim or Equity Interest entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Kurtzman Carson Consultants at (866) 381-9100.

## C.    CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on [_____, 2009, commencing at [_____ _.m. prevailing Eastern Time], before the Honorable [_____], United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801 or such other location as the Bankruptcy Court directs. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received by no later than [_____, 2009, at 4:00 p.m. prevailing Eastern Time]. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

# II.
## OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the holders of Allowed Claims and Equity Interests thereunder. This table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests:

### SUMMARY OF CLASSIFICATION AND TREATMENT
### OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| -- | Administrative Claims | Unimpaired; except with respect to Professional Fee Claims, each holder of an Allowed Administrative Claim shall either have its Claim paid in full in Cash or receive such other treatment as the Debtors or Reorganized Debtors and the holder of such Claim agree. | [$_____ | 100% |
| -- | Professional Fee Claims | Unimpaired; holders of Allowed Professional Fee Claims shall receive Cash in an amount equal to the court approved Professional Fee Claims. | -- | 100% |
| -- | Priority Tax Claims | Unimpaired; holders of Allowed Priority Tax Claims shall receive payment in full in cash or such other treatment as the Debtors or the Reorganized Debtors and the holder of such claim agree. | [$_____] | 100% |
| 1 | Other Priority Claims | Unimpaired; except to the extent that a holder of an Allowed Other Priority Claim and the Debtors or the Reorganized Debtors, as the case may be, agree to a different | [$_____] | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim. | | |
| 2 | Other Secured Claims | Unimpaired; Except to the extent that the Debtors or the Reorganized Debtors, as the case may be, and a holder of an Allowed Other Secured Claim agree to different treatment, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles such holder to demand or to receive payment of such Claim prior to the stated maturity of such Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Claim in full and complete satisfaction of such Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Claim in full and complete satisfaction | [$_____] | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | of such Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable. | | |
| 3 | Second Lien Credit Facility Claims | Impaired; On, or as soon as practicable after the Effective Date, each holder of a Second Lien Credit Facility Claim shall receive, in full and final satisfaction of such Claims, a distribution of its pro rate share of $10 million aggregate original principal amount of New Notes and its pro rata share of: (i) ____ shares of New Common Stock, which in the aggregate represents 90% of the New Common Stock to be issued pursuant to the Plan; and (ii) if Class 11 does not vote to accept the Plan, ___ shares of New Common Stock, representing 5% of the New Common Stock to be issued pursuant to the Plan, that would have otherwise been issued to Holders of Allowed Preferred Stock Equity Interests in Class 11. | $35,021,381 | [--%] |
| 4 | General Unsecured Claims | Unimpaired.  Except to the extent that the Debtors or the Reorganized Debtors, as the case may be, and a holder of an Allowed General Unsecured Claim agree to a different treatment, each holder of such Claim shall receive one of the following alternative treatments, at the election of the Reorganized | $244,306 | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | Debtors: (i) to the extent then due and owing on the Effective Date, payment in full in Cash on the Initial Distribution Date in the Allowed amount of such Claim; (ii) to the extent not due and owing on the Effective Date, such Claim shall either (A) be paid in full in Cash on the Effective Date, or (B) be paid in full in Cash when and as such Claim becomes due and owing in the ordinary course of business; or (iii) such Claim will be otherwise treated in any other manner so that such Claim shall be rendered Unimpaired. | | |
| 5 | Unliquidated Claims | Unimpaired; All Unliquidated Claims are Disputed Claims and shall be liquidated, determined and satisfied (to the extent required) in the ordinary course of business by the Debtors or the Reorganized Debtors, as the case may be, without need for Court approval, including, where applicable, through access to available insurance. | -- | N/A |
| 6 | Intercompany Claims | Unimpaired; all Intercompany Claims shall be adjusted, continued, or discharged to the extent appropriate by the Reorganized Debtors. | -- | N/A |
| 7 | First Lien Credit Facility Claims | Unimpaired; Each Allowed First Lien Credit Facility Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy | [$_____] | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Estimated Aggregate Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|
| | | Code. | | |
| 8 | Subordinated Securities Claims | Impaired; Holders of Subordinated Securities Claims shall not receive any distributions pursuant to the Plan. | | 0% |
| 9 | Equity Interests in Surviving Debtors Other Than TCMI | Unimpaired; each holder of an Equity Interest in a Surviving Debtor other than TCMI shall retain such Equity Interest. | | 100% |
| 10 | Common Stock Equity Interests of Non-Surviving Debtors and TCMI | Impaired; Holders of Common Stock Equity Interests of Non-Surviving Debtors and TCMI shall not receive any distributions pursuant to the Plan. | [$_____] | 0% |
| 11 | Preferred Stock Equity Interests | Impaired; To the extent Class 11 votes to accept the Plan, Holders of Preferred Stock Equity Interests, in full and final satisfaction and settlement of their Preferred Stock Equity Interests, shall receive on the Effective Date, its pro rata share of _____ shares of New Common Stock, which in the aggregate, represents five percent of the New Common Stock issued pursuant to the Plan. If Class 11 does not vote to accept the Plan, holders of the Preferred Stock Equity Interests shall not receive any distribution under the Plan. | [$_____] | [____%] |

# III.
# OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a chapter 11 plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan, and substitutes obligations as specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or equity interests in a debtor that are impaired by the plan are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare and obtain court approval of a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to satisfy the requirement of section 1125 of the Bankruptcy Code.

# IV.
# COMPANY BACKGROUND

## A.    THE DEBTORS' BUSINESS

The Debtors operate a newspaper publishing business in certain communities in the Atlanta, Georgia metropolitan area and western Georgia. The Debtors own and operate six daily newspapers and one weekly newspaper, with daily circulation of approximately 95,000 and Sunday circulation of approximately 132,000.

The newspapers include The Albany Herald (located in Albany, GA), Rockdale Citizen (located in Conyers, GA), Newton Citizen (located in Covington, GA), Gwinnett Daily Post (located in Lawrenceville, GA), The Jackson Progress-Argus (located in Jackson, GA), The Henry Daily Herald (located in McDonough, GA), and the Clayton News Daily (located in Jonesboro, GA). These community newspapers focus on local content, including coverage of

local youth, high school and college sports, as well as local business, politics, entertainment and cultural news. Each newspaper is tailored to its market in order to provide local content that radio, television and large metropolitan daily newspapers are unable to provide on a cost-effective basis due to their broader geographic coverage. As community newspapers with locally-driven content, the Debtors are able to differentiate themselves from other forms of media by providing a cost-effective medium for local advertisers to target their customers.

To publish the newspapers, the Debtors operate three production and distribution facilities that are strategically located throughout their markets. By maintaining three facilities, the Debtors are able to reduce the operating costs while increasing the quality of the newspapers. The Debtors maintain high product quality standards and use extensive process color and compelling graphic design to fully engage existing readers and to attract new customers. The newspapers are generally fully paginated utilizing image-setter technology, which allows for design flexibility and high-quality reproduction of color graphics. The newspapers are printed on efficient, high-speed web offset presses. Distribution is outsourced to independent, third-party distributors.

Revenues are driven by circulation and advertising. Subscriptions and daily sales of newspapers account for approximately 10% of revenues. The percentage of revenues coming from newspaper sales is relatively static as the number of readers drives the rates the Debtors are able to charge for advertisements. Since the beginning of 2006, total circulation of the seven newspapers published by the Debtors has decreased over 11%. This drop in circulation has followed national trends both because of the recession generally and as more individuals receive their news from alternative sources, primarily the internet.

Advertising revenue, which is derived from a diverse group of local retailers and classified advertisers accounts for approximately 87% of overall revenues. Local advertising has historically been more stable than national advertising because local businesses generally have fewer effective advertising channels through which to reach their customers. Local advertisers include financial institutions, retail stores, realtors, automobile dealerships, grocery stores, universities, hospitals and other similar types of businesses, with no individual advertiser representing more than 2% of the Debtors' total revenue.

## B.   THE DEBTORS' ORGANIZATIONAL STRUCTURE AND HISTORY

Until December 30, 2005, the Debtors were a part of an integrated business owned and operated by Gray Television, Inc. ("Gray TV"). As a result of a spin-off from Gray TV, the Debtors retained the newspaper publishing business and GrayLink Wireless and through a related merger, the Debtors added collegiate marketing and management service segments. During 2007, in a series of transactions, the GrayLink Wireless, collegiate marketing and management services segments were each sold. As a result, the Debtors' sole remaining operating segment consists of the newspaper publishing business.

Triple Crown Media, Inc. is the holding company and the sole member of Triple Crown Media, LLC. Triple Crown Media, LLC is the sole member of the primary operating entity, Gray Publishing, LLC and sole shareholder of B.R. Acquisition Corp. B.R. Acquisition Corp is

the sole shareholder of B.R. Holding, Inc., which is the sole shareholder of Capital Sports Properties, Inc. and Datasouth Computer Corporation. B.R. Acquisition Corp., and its direct and indirect subsidiaries are not operating entities and have no employees.

Gray Publishing employs approximately 330 employees along with temporary employees and numerous independent contractors, nearly all of which are located in the Atlanta, Georgia metropolitan area or in the area of Albany in southwestern Georgia.

## C.  THE DEBTORS' DEBT STRUCTURE

### *First Lien Senior Secured Credit Facility:*

Concurrent with the spin-off and merger, on December 30, 2005, Debtor Triple Crown Media, LLC entered into a senior secured credit facility, with the lenders from time to time parties thereto (the "First Lien Lenders") and Deutsche Bank ("Deutsche") (as successor to Wachovia Bank, National Association ("Wachovia")) as Administrative and Collateral Agent (as amended, the "First Lien Credit Facility"). Debtors Triple Crown Media, Inc, BR Acquisition Corp., BR Holding, Inc., Datasouth Computer Corporation, Gray Publishing, LLC, and Capital Sports Properties, Inc. (collectively, the "Guarantors"), were among the guarantors thereto. The First Lien Credit Facility sets forth the terms and conditions of debt financing in an aggregate principal amount of up to $110 million, consisting of a 4-year $20 million revolving credit facility (as amended, the "First Lien Revolving Credit Facility") and a 4.5-year $90 million first lien term loan (as amended, the "First Lien Term Loan Facility").

The security underlying the First Lien Credit Facility consists of a first priority security interest, subject to permitted liens, in all of the Debtors' equipment, inventory, receivables and related security agreements and related contracts, security collateral including pledged equity, pledged debt, securities and commodities accounts, and other investment property, intellectual property agreements and all patents, trademarks, copyrights, computer software, trade secrets, and any and all registrations, applications or other supplements to various intellectual property, commercial tort claims, and other assets, whether currently owned or later acquired (collectively, the "Collateral").

Through the Amendments (as defined below), the terms of the First Lien Credit Facility have been substantially modified. As of the Commencement Date, the First Lien Credit Facility consists of the First Lien Term Loan Facility, with a principal balance of approximately $20,300,000 and the First Lien Revolving Loan Facility, with a principal balance of approximately $18,300,000. The Debtors have agreed to not borrow additional funds under the First Lien Revolving Loan Facility, and pay in full the obligations thereunder as of December 31, 2010 (the "First Lien Maturity Date"). In addition, the Debtors currently have $375,000 in outstanding letters of credit.

### *Second Lien Senior Secured Credit Facility*

Concurrent with entry into the First Lien Credit Facility, Triple Crown Media, LLC and the Guarantors entered into a 5-year second lien term loan in the original principal amount of $30

million (as amended, the "Second Lien Credit Facility" and, together with the First Lien Credit Facility, the "Credit Facilities") with the lenders from time to time party thereto (the "Second Lien Lenders" and together with the First Lien Lenders, the "Lenders") and Wilmington Trust ("Wilmington") (as successor to Wachovia) as the Administrative and Collateral Agent.

Pursuant to the terms of an Inter-Creditor Agreement entered into by and between Wachovia on behalf of the First Lien Lenders, Wachovia on behalf of the Second Lien Lenders, and Triple Crown Media, LLC as Borrower, the Second Lien Credit Facility is secured by a lien against the Collateral, subordinate in priority to the liens under the First Lien Credit Facility.

As of the Commencement Date, the Debtors had obligations of principal and interest on the Second Lien Credit Facility of approximately $35,021,381.83

### *The Amendments*

Since entry into the Credit Facilities, the economy has faltered and the newspaper business has experienced industry-wide struggles. Additionally, through the 2007 sale of certain business units, the Debtors financing needs have changed. As a result, in order to stay in compliance with the financial covenants set forth in the Credit Facilities and to adjust the Credit Facilities for the current business operations, the Debtors and the Fist Lien Lenders and Second Lien Lenders have entered into a series of amendments (collectively, the "Amendments") to the Credit Facilities.

On May 19, 2006 the Debtors entered into the first amendments to the Credit Facilities. (the "First Amendments"). Pursuant to the First Amendments, certain borrowing conditions were modified as were certain financial covenant the Debtors' were required to meet.

On September 14, 2006, in conjunction with their acquisition of Pinnacle Sports Promotions, LLC ("Pinnacle") (the "Pinnacle Acquisition"), the Debtors entered into the second amendments to the Credit Facilities (the "Second Amendments"). Pursuant to the Second Amendments, the Debtors were authorized to acquire Pinnacle and agreed to certain modifications to the applicable interest rate margins and financial covenants.

On November 7, 2007, in contemplation of the sale of certain business units operated by Host Communications, Inc. (the "Host Sale"), the Debtors entered into the third amendments to the Credit Facilities (the "Third Amendments"). Under the Third Amendments, the Debtors were authorized to consummate the Host Sale and the Lenders agreed to temporarily waive certain financial covenants resulting from the Host Sale. As consideration for entry into the Third Amendments, the Debtors agreed, among other modifications to the terms of the Credit Facilities, to use the proceeds of the Host Sale to pay down the obligations under the First Lien Credit Facility.

On February 15, 2008, as a result of being out of compliance on their financial covenant requirements, the Debtors entered into the fourth amendments to the Credit Facilities (the "Fourth Amendments"). Pursuant to the Fourth Amendments, the Debtors agreed to modifications to the interest rates on the Credit Facilities in exchange for waiving the events of

default and reducing the future financial covenant obligations. In addition, the Debtors agreed to limit their capital expenditures. Despite the modifications, in December 2008, the Debtors received notice they were in default under the First Lien Credit Facility, and as a result, they began negotiations on a fifth amendment.

On March 12, 2009, the Debtors entered into the fifth amendments to the First Lien Credit Facility (the "First Lien Fifth Amendment") and to the Second Lien Credit Facility (the "Second Lien Fifth Amendment" and together with the First Lien Fifth Amendment, the "Fifth Amendments"). Under the First Lien Fifth Amendments, the Debtors and First Lien Lenders agreed to waive certain events of default including continued non-compliance with various financial covenants. The parties also agreed to extend the maturity dates on the First Lien Revolving Credit Facility, cease all future advances under the First Lien Revolving Credit Facility, and amend various provisions of the Credit Facilities, including financial covenants.

Pursuant to the terms of the Second Lien Fifth Amendment, in exchange for the waiver of certain events of default and extension of the maturity date, the Debtors agreed that, within 120 days of the effective date, they would issue warrants to the Second Lien Lenders, enter into management arrangements, and consummate a "going dark" transaction in which they would no longer be required to file periodic reports with the SEC. In addition, the Debtors agreed to modifications to the terms and interest rates applicable to the Second Lien Credit Facility. The warrants, if exercised, would permit the Second Lien Lenders to acquire a number of shares equal to 80% of the issued and outstanding stock of the Debtors.

## D.     THE DEBTORS' EQUITY STRUCTURE

The Debtors have three classes of stock: Series A Preferred Stock, Series B Preferred Stock and Common Stock (each defined below). As of December 31, 2008, there were 20,890 shares outstanding of the Series A redeemable, convertible preferred stock (the "Series A Preferred Stock and the holder thereof, the "Series A Preferred Stockholders"). The Series A Preferred Stock has an aggregate face value of $20.9 million and, upon certain conditions, is convertible to common stock. As of December 31, 2008, J. Mack Robinson and certain entities and individuals associated with Mr. Robinson were the sole Series A Preferred Stockholders. The Series A Preferred Stockholders are entitled to certain dividends, which have not been paid, and to a liquidation preference over the holders of common stock.

As of December 31, 2008, there were 6,050 shares outstanding of the Series B convertible preferred stock (the "Series B Preferred Stock", and together with the Series A Preferred Stock, the "Preferred Stock"; and the holders thereof the "Series B Preferred Stockholders", which together with the Series A Preferred Stockholders are the "Preferred Stockholders"). The Series B Preferred Stock has a face value of $6.1 million and is convertible, at the Debtors' option, to Common Stock (as defined below). Series B Preferred Stockholders are entitled to annual dividends that have not been paid.

Finally, there are approximately 5.59 million shares of outstanding common stock (the "Common Stock" and the holders thereof, the "Common Stockholders"). The Common Stock is currently traded on the pink sheets under the ticker symbol TCMI.PK.

# V.
## EVENTS LEADING TO THE COMMENCEMENT
## OF THE CHAPTER 11 CASES

Pursuant to the terms of the Second Lien Fifth Amendment, the deadline for the Debtors to convert the Preferred Stock to Common Stock and to issue certain warrants, convertible to a majority interest in the Common Stock, to the Second Lien Lenders was July 29, 2009. However, the Debtors did not issue the warrants, enter into the management arrangements, or complete the going dark transaction. On July 27, 2009, the Debtors and the Lenders agreed to an extension of time to permit the Debtors to either complete the requirements of the Fifth Amendments or otherwise reach a consensual restructuring of the Debtors' financial structure, which was further extended through September 8, 2009.

The Debtors were faced with over $70 million in secured debt between the Credit Facilities, with in excess of $40 million becoming due and owing at the end of 2010 and the remainder due the following year. Although, operationally, the Debtors are positioned to cash flow on a month to month basis, the market conditions and financial projections made it apparent that the Company was significantly over-levered and would be unable to obtain and service replacement financing as necessary. After a full analysis of the benefits and burdens of the options facing the Debtors, the Debtors determined, in the exercise of their business judgment, the most appropriate course of action was not to consummate their obligations under the Second Lien Fifth Amendment, but to seek a consensual restructuring of their debt via the commencement of these chapter 11 proceedings.

On September 14, 2009, the Debtors and the Supporting Second Lien Lenders agreed to the terms of the proposed Joint Plan of Reorganization under chapter 11 of the Bankruptcy Code. In contemplation of the proposed Plan, the Debtors entered into a Restructuring Support Agreement (the "RSA") with the Second Lien Lenders that are signatories thereto, wherein holders of greater than two-thirds of outstanding principal of the Second Lien Credit Facility have agreed to support the Plan, subject to certain terms and conditions contained within the RSA.

# VI.
## THE CHAPTER 11 CASES

## A.    SIGNIFICANT "FIRST DAY" MOTIONS

On the Commencement Date the Debtors filed several motions with the Court seeking authorization for the Debtors to pay various prepetition Claims. These motions were designed to ease the strain of the Debtors' relationships with customers, employees and vendors as a consequence of the chapter 11 filings. The Court entered orders authorizing the Debtors, among other things, to (i) pay prepetition compensation, benefits and reimbursable employee expenses; (ii) continue certain workers' compensation programs and insurance policies; (iii) continue certain customer practices and programs; (iv) pay prepetition claims of general unsecured creditors in the ordinary course of business; (v) set a bar date by which creditors required to file a proof of claim must file a proof of claim and otherwise exempting certain parties from the

requirement to file a proof of claim (the "Bar Date Order"); and (vi) use the Lenders' cash collateral and grant replacement liens, super-priority administrative expense status and adequate protection to the Lenders.

In addition, the Debtors filed several applications seeking orders authorizing the Debtors' retention of professional advisors. Specifically, the Debtors filed applications to retain (i) Dinsmore & Shohl LLP and Morris, Nichols, Asht & Tunnell, LLP, as counsel, (ii) Caymus Partners, as financial advisors, and (iii) certain ordinary course professionals. The Debtors also filed motions seeking relief from certain administrative requirements of the Bankruptcy Code.

## B.    CASH COLLATERAL

To allow the Debtors the cash and liquidity necessary to continue operating and to maintain normal vendor relations post-petition, on the Commencement Date the Debtors also sought Court approval of the use of the Lenders' cash collateral pursuant to the Emergency Motion of the Debtors and Debtors-In-Possession for Interim and Final Orders Under 11 U.S.C. 105, 361, 362, 363, 552 and Fed. R. Bank. P. 2002, 4001, and 9014, (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling a Final Hearing Pursuant to Fed. R. Bank. P. 4001(b) (the "Cash Collateral Motion") and the budget attached thereto (the "Cash Collateral Motion"). On [_____, 2009], the Court approved the Cash Collateral Motion on an interim basis. On [_____, 2009], the Court entered a final order (the "Cash Collateral Order") approving the use of cash collateral. As adequate protection for the use of Cash Collateral, the Debtors granted the Lenders replacement liens on all assets subject to the Lenders' pre-petition security interests, super-priority administrative claims, and payment of professional fees.

## VII.
## CONVERSION OF DEBT TO EQUITY PURSUANT TO THE PLAN

On September 11, 2009, the Debtors entered into the Restructuring Support Agreement (the "RSA") with the Supporting Second Lien Lenders. Pursuant to the RSA, the Second Lien Lenders signatories thereto have agreed to support the Plan.

The Debtors, in the exercise of their business judgment, believe the proposed restructuring, as set forth in the Plan, is the best way to maximize the value of the estates for Creditors. The Plan provides for the Second Lien Lenders, holders of Preferred Stock Equity Interests, and Management to own the stock of Reorganized TCMI with the Second Lien Lenders holding 90% of the newly issued stock. Pursuant to the terms of the RSA, certain milestones must be reached, which include:

a)    This Disclosure Statement must have been approved by the Bankruptcy Court no later than forty-five (45) calendar days after the Commencement Date;

b)    The order of the Bankruptcy Court confirming the Plan (the "Confirmation Order"), shall have been entered by the Bankruptcy Court no later than ninety (90) calendar days after the Commencement Date;

c) The Effective Date of the Plan (the "Effective Date") shall have occurred on the date that is one hundred (100) days after the Commencement Date;

In addition, any of the following would constitute an event of default under the RSA:

a) The filing of any plan of reorganization or disclosure statement that is materially inconsistent with the Plan Term Sheet and not acceptable to the Agent and the Required Supporting Second Lien Lenders in the sole discretion of each;

b) The withdrawal, amendment, modification of (or the filing of a pleading by the Debtors seeking to withdraw, amend or modify) the Plan, the Disclosure Statement, or other Plan Document n a manner that is materially inconsistent with the Plan Term Sheet or the RSA and not acceptable to the Agent and the Required Supporting Second Lien Lenders in the sole discretion of each;

c) The filing of any pleading by the Debtors seeking to (i) voluntarily dismiss any Chapter 11 Case, (ii) convert any Chapter 11 Case to chapter 7 of the Bankruptcy Code, or (iii) appoint a trustee, an examiner, or a similar fiduciary with expanded powers pursuant to section 1104 of the Bankruptcy Code in any Chapter 11 Case;

d) The entry of an order by the Bankruptcy Court (i) dismissing any Chapter 11 Case, (ii) converting any Chapter 11 Case to chapter 7 of the Bankruptcy Code, or (iii) appointing a trustee, an examiner, or a similar fiduciary with expanded powers pursuant to section 1104 of the Bankruptcy Code in any Chapter 11 Case;

e) The issuance of an order by any court of competent jurisdiction or other governmental or regulatory authority that prohibits or restricts the restructuring, the Plan, or the transactions contemplated under the Plan and Plan Term Sheet in a manner that cannot be reasonably remedied by the Debtors;

f) The filing of any pleading or commencement of any action by the Debtors (or the joinder of the Debtors in or support by the Debtors of any such pleading or action) seeking to prime or challenge the validity, enforceability, perfection, or priority of any line or security interest securing the Second Lien Claims under the Second Lien Credit Documents; or

g) The filing of any pleading or commencement of any action by the Debtors (or the joinder of the Debtors in or support by the Debtors of any such pleading or action) against the Agent or any Supporting Lien Lender with respect to the Second Lien Claims or Second Lien Credit Documents.

**VIII.**
**SUMMARY OF THE PLAN**

THE FOLLOWING SECTIONS SUMMARIZE CERTAIN KEY INFORMATION CONTAINED IN THE PLAN. THIS SUMMARY REFERS TO, AND IS QUALIFIED IN ITS ENTIRETY BY, REFERENCE TO THE PLAN. THE TERMS OF THE PLAN

**WILL GOVERN IN THE EVENT ANY INCONSISTENCY ARISES BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN. THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN DO NOT YET BIND ANY PERSON OR ENTITY. IF THE BANKRUPTCY COURT DOES CONFIRM THE PLAN, HOWEVER, THEN IT WILL BIND ALL CLAIM AND EQUITY INTEREST HOLDERS.**

## A.    INTRODUCTION

The Plan provides for the reduction of more than $20 million of the Debtors' secured obligations and the distribution of no less than 90% of the equity of Reorganized TCMI to the Second Lien Lenders and provides for participation rights by the holders of Preferred Stock Equity Interests and by the Management of Reorganized TCMI. The Debtors believe this financial restructuring provides the Second Lien Lenders and the holders of Preferred Stock Equity Interests with a greater distribution than each party would receive if the Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code. The Plan is annexed hereto as Exhibit A and is incorporated herein as part of the Disclosure Statement.

## B.    CLASSIFICATION AND TREATMENT OF ADMINISTRATIVE CLAIMS, CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

The Plan classifies Claims and Equity Interests separately and provides different treatment for different Classes of Claims and Equity Interests in accordance with the Bankruptcy Code. As described more fully below, the Plan provides, separately for each Class, that holders of certain Claims will receive various amounts and types of consideration thereby giving effect to the different rights of holders of Claims and Equity Interests in each Class.

Only administrative expenses, and claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An "allowed" administrative expense, claim or equity interest simply means that the Debtors or Reorganized Debtors agree, or in the event of a dispute, that the Court determines, that the administrative expense, claim, or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, the Debtors. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim, or equity interest is automatically "allowed" unless the debtor or another party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest on unsecured and/or under-secured obligations, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed their reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, except as otherwise provided in the Bar Date Order, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and equity interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan must divide the different claims against, and equity interests in, the debtors into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims of interests, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan or the date on which amounts owing are due and payable, payment in full, in cash, with post-petition interest to the extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the same position it would have been in had the debtor's case not been commenced.

Consistent with these requirements the Plan divides the Claims against, and Equity Interests in, the Debtors into the following Classes and affords the treatments described below:

| Unclassified | Administrative Claims | Paid in full |
|---|---|---|
| Unclassified | Priority Tax Claims | Paid in full |
| Unclassified | Professional Fee Claims | Paid in full |
| Class 1 | Other Priority Claims | Unimpaired |
| Class 2 | Other Secured Claims | Unimpaired |

| Class 3 | Second Lien Credit Facility Claims | Impaired |
| Class 4 | General Unsecured Claims | Unimpaired |
| Class 5 | Unliquidated Claims | Unimpaired |
| Class 6 | Intercompany Claims | Unimpaired |
| Class 7 | First Lien Credit Facility Claims | Unimpaired |
| Class 8 | Subordinated Securities Claims | Impaired |
| Class 9 | Debtors' Interests in Surviving Debtors Other Than TCMI | Impaired |
| Class 10 | Common Stock Equity Interests of Non-Surviving Debtors and TCMI | Impaired |
| Class 11 | Preferred Stock Equity Interests | Impaired |

For purposes of computing distributions under the Plan, Allowed Claims do not include post-petition interest unless otherwise specified in the Plan.

### 1. Unclassified — Administrative Claims

Administrative Claims are any rights to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under section 502(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent awarded by the Court under sections 330, 331 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Debtors' Estates under section 1930 of title 28 of the United States Code.

Except with respect to Professional Fee Claims, each holder of an Allowed Administrative Claim shall receive (a) Cash in an amount equal to the amount of such Allowed Administrative Claim on the later of the Initial Distribution Date and the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, or (b) such other treatment as the Debtors or the Reorganized Debtors, as the case may be, and such holder shall have agreed upon; provided, however, that Allowed Ordinary Course Administrative Claims shall be paid in full in the ordinary course of business by the

Reorganized Debtors in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

### 2. Unclassified - Professional Fee Claims

Except to the extent that a holder of a Professional Fee Claim fails to file and serve appropriate fee applications in a timely manner and the Court withholds payment of the Professional Fee Claims, holders of Professional Fee Claims shall receive Cash in an amount equal to the Allowed amount of their respective court approved Professional Fee Claims.

### 3. Unclassified—Priority Tax Claims

A Priority Tax Claim consists of any Claim that is entitled to a priority in right of payment under section 502(i) or 507(a)(8) of the Bankruptcy Code.

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtors or the Reorganized Debtors, as the case may be, agree to a different treatment, or the Bankruptcy Court has previously ordered otherwise, each holder of an Allowed Priority Tax Claim shall receive Cash in an amount equal to the amount of such Allowed Priority Tax Claim on the later of the Initial Distribution Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as practicable. All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business without post-petition interest in accordance with the terms thereof.

### 4. Class 1—Other Priority Claims

Other Priority Claims are Claims that are entitled to priority pursuant to section 507(a) of the Bankruptcy Code - other than Administrative Claims and Priority Tax Claims. Such claims may include (i) unsecured Claims for accrued employee compensation earned within 180 days prior to commencement of these Chapter 11 Cases to the extent of $10,950 per employee and (ii) contributions to employee benefit plan arising from services rendered within 180 days prior to the commencement of these Chapter 11 Cases, but only for each such plan to the extent of (a) the number of employees covered by such plan multiplied by $10,950, less (b) the aggregate amount paid to such employees as a priority for wages, salaries or commissions, plus the aggregate amount paid on behalf of such employees to other benefit plans.

Because the Bankruptcy Court entered an order authorizing the Debtors to pay, among other things, unpaid prepetition employee compensation and benefits, the Debtors estimate the Allowed Claims in Class 1 that are due and payable pursuant to the Plan on or before the Effective Date will be nominal, if any.

Except to the extent that the Debtors or the Reorganized Debtors, as the case may be, and a holder of an Allowed Other Priority Claim agree to a different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, payment in full in Cash in an amount equal to such Allowed Other Priority Claim on the later of the Initial Distribution Date and the date when such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon thereafter as is practicable. All Allowed Other Priority Claims which

are not due and payable on or before the Effective Date shall be paid by the Reorganized Debtors in the ordinary course of business in accordance with the terms thereof.

Class 1 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims in Class 1 are presumed to accept the Plan and are not entitled to vote to accept to reject the Plan.

### 5. Class 2—Other Secured Claims

Other Secured Claims means any Secured Claim (including a perfected mechanics lien), other than the First Lien Credit Facility Claims and the Second Lien Credit Facility Claimsor, in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, the amount of such Claim that is subject to such setoff.

Except to the extent that the Debtors or the Reorganized Debtors, as the case may be, and a holder of an Allowed Other Secured Claim agree to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, as the case may be, in full and final satisfaction of such Claim, (i) each Allowed Other Secured Claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Allowed Other Secured Claim to demand or to receive payment of such Allowed Other Secured Claim prior to the stated maturity of such Allowed Other Secured Claim from and after the occurrence of a default, (ii) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable, or (iii) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Initial Distribution Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

Class 2 is Unimpaired under the Plan. The holders of Allowed Other Secured Claims in Class 2 are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

### 6. Class 3 - Second Lien Credit Facility Claims

The holders of Allowed Class 3 Second Lien Credit Facility Claims shall receive, in full and final satisfaction of such claim, a distribution of its pro rata share of the $10 million aggregate original principal amount of New Notes and its pro rata share of: (i)_____ shares of new common stock, representing 90% of the New Common Stock to be issued pursuant to the Plan; and (ii) if Class 11 does not vote to accept the Plan, ___ shares of New Common Stock, representing 5% of the New Common Stock to be issued pursuant to the Plan, that would have otherwise been issued to Holders of Allowed Preferred Stock Equity Interests in Class 11.

Class 3 is Impaired under the Plan. Holders of Second Lien Credit Facility Claims are entitled to vote to accept or reject the Plan.

### 7. Class 4 — General Unsecured Claims

A General Unsecured Claim means an Unsecured Claim against any of the Debtors that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim, First Lien Credit Facility Claim, Second Lien Credit Facility Claim, Unliquidated Claim, Professional Fee Claim, Subordinated Securities Claim, Intercompany Claim, or Equity Interest.

The legal, equitable and contractual rights of holders of Class 4 General Unsecured Claims shall be unaltered by the Plan. Except to the extent that the Debtors or the Reorganized Debtors, as the case may be, and a holder of a General Unsecured Claim agree to a different treatment, each holder of an Allowed Class 4 General Unsecured Claim shall receive one of the following alternative treatments, at the election of the Reorganized Debtors:

(i) to the extent then due and owing on the Effective Date, payment in full in Cash on the Initial Distribution Date in the Allowed amount of the General Unsecured Claim;

(ii) to the extent not due and owing on the Effective Date, such Allowed General Unsecured Claim shall either (A) be paid in full in Cash by the Reorganized Debtors on the Effective Date, or (B) be paid in full in Cash by the Reorganized Debtors when and as such Claim becomes due and owing in the ordinary course of business; or

(iii) such Allowed General Unsecured Claim will be otherwise treated in any other manner so that such Claim shall be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

Any default with respect to any Class 4 General Unsecured Claim that existed immediately prior to the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.

Class 4 is Unimpaired under the Plan. Each holder of an Allowed General Unsecured Claim is presumed to accept the Plan and is not entitled to vote accept or reject the Plan.

### 8.     Class 5 -- Unliquidated Claims

Unliquidated Claims are Disputed Claims that will be liquidated, determined and satisfied (to the extent required) in the ordinary course of business by the Debtors or Reorganized Debtors, as the case may be, without need for court approval, including, where applicable, through access to available insurance.

On and after the Effective Date, holders of Unliquidated Claims may commence or continue any action, prosecute such action to judgment or settlement and/or pursue any such Unliquidated Claims, each solely to the extent and the basis set forth in a timely and validly filed proof of claim, without prejudice to any defense, right of set off or other rights, claims or counter claims available to or belonging to the Debtors or the Reorganized Debtors.

Class 5 is Unimpaired under the Plan. Each holder of an Unliquidated Claim is presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

### 9.     Class 6 -- Intercompany Claims

Intercompany Claims consist of claims of one Debtor against another Debtor. All Intercompany Claims will be adjusted, continued, or discharged to the extent determined appropriate by the Reorganized Debtors. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders of the Reorganized Debtors.

Class 6 is Unimpaired under the Plan. Holders of Intercompany Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

### 10.     Class 7 -- First Lien Credit Facility Claims

Each Allowed First Lien Credit Facility Claim shall be reinstated and rendered unimpaired in accordance with section 1142(2) of the Bankruptcy Code.

Class 7 is unimpaired under the Plan. Holders of Allowed First Lien Credit Facility Claims are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

### 11.     Class 8— Subordinated Securities Claims

The holders of Subordinated Securities Claims shall not receive any distribution pursuant to the Plan.

Holders of Subordinated Securities Claims are Impaired under the Plan. The holders of Subordinated Securities Claims are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

### 12.     Class 9 - Debtors' Interests in Surviving Debtors Other Than TCMI

The holders of Debtors' Interests in Surviving Debtors other than TCMI shall be entitled to retain such Equity Interests pursuant to the Plan.

Class 9 is unimpaired. The holders of Debtors' Interests in Surviving Debtors other than TCMI are presumed to accept the Plan and are not entitled to vote to accept or reject the Plan.

### 13.     Class 10 -- Common Stock Equity Interests of Non-Surviving Debtors and TCMI

Common Stock Equity Interests of the Non-Surviving Debtors and TCMI means the outstanding common stock or membership interests in the Non-Surviving Debtors and TCMI, any option warrant or other right to acquire Common Stock or membership interests in the Non-Surviving Debtors and TCMI, as applicable, each in existence on and as of the Effective Date.

All Common Stock Equity Interests in the Non-Surviving Debtors and TCMI shall be cancelled on the Effective Date, and the holders of Common Stock Equity Interests of the Non-Surviving Debtors and TCMI shall not receive any distribution under the Plan.

Class 10 is Impaired under the Plan. Holders of Common Stock Equity Interests of the Non-Surviving Debtors and TCMI are presumed to reject the Plan and are not entitled to vote to accept or reject the Plan.

### 14. Class 11 -- Preferred Stock Equity Interests

Solely to the extent Class 11 votes to accept the Plan, each holder of Allowed Preferred Stock Equity Interests, in full and final satisfaction and settlement of their Preferred Stock Equity Interests, shall receive on the Effective Date their pro rata share of _____ shares of New Common Stock, representing five percent (5%) of the New Common Stock to be issued pursuant to the Plan. If Class 11 does not vote to accept the Plan, holders of Class 11 Preferred Stock Equity Interests shall not receive any distribution under the Plan.

Class 11 is impaired under the Plan. Holders of Preferred Stock Equity Interests are entitled to vote to accept or reject the Plan.

## C. VOTING ON THE PLAN

Each holder of a Class 3 Second Lien Credit Facility Claim and a Class 11 Preferred Stock Equity Interest shall be entitled to vote to accept or reject the Plan as provided in such order as may be entered by the Court establishing certain procedures with respects to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Court.

## D. DISTRIBUTIONS UNDER THE PLAN

### 1. Delivery of Distributions.

With the exception of the distributions to holders of Allowed Second Lien Credit Facility Claims, distributions under the Plan to Creditors entitled to receive a distribution shall be made by the Reorganized Debtors, or their designee, to the holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed First Lien Credit Facility Claims, Allowed Other Secured Claims, Allowed General Unsecured Claims and Preferred Stock Equity Interests at the addresses set forth on the Schedules, unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001 on or prior to the Voting Record Date or in the case of General Unsecured Claims not required to file proofs of claim, to the address provided under each holder's purchase order, bill or other address to which the Debtors typically make payments to such Creditors (or at the last known addresses of such holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address). Distributions on account of the Allowed Second Lien Credit Facility Claims shall be made initially to the New Notes Agent who shall, in turn, make the distributions to such holders consistent with the terms of the New Notes Agreement.

## 2.    Distributions of Cash.

Any payment of Cash made by the Reorganized Debtors pursuant to the Plan shall be made at the option and in the sole discretion of the Reorganized Debtors, by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

## 3.    Allocation of Distributions

Any Disbursement made pursuant to the terms of the Plan to creditors entitled to receive such distribution shall be made first, to principal, and only once the full principal obligation is paid in full shall the distribution be allocated to any accrued interest.

## 4.    Fractional Dollars

Notwithstanding any other provision of this Plan to the contrary, no payment of fractions of dollars will be made.  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar.

## 5.    Unclaimed Distributions.

Any Distribution of Cash under the Plan to the holder of an Allowed Claim which remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan shall be transferred to and become property of the Reorganized Debtors notwithstanding any state or other escheat or similar laws to the contrary, and any and all entitlement by the holder of such Claim to such Distribution shall be extinguished and forever barred.

## 6.    Timing of Distributions, Saturdays, Sundays or Legal Holidays.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

## 7.    Distribution to Holders of Allowed Claims as of the Voting Record Date.

As of the close of business on the Voting Record Date, the Claims register shall be closed, and there shall be no further changes in the record holders of any Claims.  The Debtors and the Reorganized Debtors shall have no obligation to recognize any Claim filed or the transfer of any Claims occurring after the Voting Record Date.  The Debtors and the Reorganized Debtors shall instead be entitled to recognize and deal for purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Voting Record Date.

## 8.    Time Bar to Cash Payments by Check

Checks issued on account of Allowed Claims will be null and void if not negotiated within 60 days after the date of issuance thereof. Requests for reissuance must be made to the Reorganized Debtors by the holder of the Allowed Claims to whom such check was originally issued. All Claims for undeliverable or voided checks must be made within 90 days after the date such distribution was made. After the expiration of the 90 day period, all such distributions will be treated as unclaimed property in accordance with the Plan and section 347(b) of the Bankruptcy Code.

## E.    OBJECTIONS TO AND RESOLUTION OF CLAIMS

### 1.    <u>Objections to and Resolution of Administrative Claims and Claims</u>

The Reorganized Debtor shall have the right to make and to file objections to, or otherwise contest the allowance of Administrative Claims (other than Professional Fee Claims) and Claims subsequent to the Effective Date. Unless otherwise ordered by the Court, objections to, or other proceedings concerning the allowance of, Administrative Claims and Claims (other than Unliquidated Claims) shall be filed and served upon the holders of the Administrative Claims or Claims as to which the objection is made, or otherwise commenced, as the case may be, as soon as practicable, but in no event later than the Claims Objection Deadline. Objections to Professional Fee Claims shall be filed and served no later than ninety (90) days (or such longer period as may be allowed by order of the Court) after the Effective Date.

Objections to, or other proceedings contesting the allowance of, Administrative Claims and Claims may be litigated to judgment, settled or withdrawn, in the discretion of the Reorganized Debtors. The Reorganized Debtors may settle any such objections or proceedings without Court approval. Notwithstanding anything herein to the contrary, no objections shall be required to be filed with respect to any Unimpaired Claims or Unliquidated Claims, which shall be liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors, as provided in the Plan.

None of the Debtors nor the Reorganized Debtors shall be required to establish reserves for the payment of Disputed Claims or Unliquidated Claims.

## F.    ESTIMATION

The Debtors or the Reorganized Debtors, as the case may be, may at any time request that the Court estimate, subject to 28 U.S.C. § 157, any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party has previously objected to such Claim. The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (a) the Allowed amount of such Claim, (b) the estimate to be used in calculating potential Distributions under the Plan, or (c) a maximum limitation on such Claim, as determined by the Court, in each case as determined by the Debtors or the Reorganized Debtors, as the case may be. In the case of Unliquidated Claims arising from personal injury tort or wrongful death actions, the Court may estimate such Claims for the purpose of confirming a plan of reorganization. If the estimated amount constitutes a

maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as the case may be, may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

## G. CANCELLATION AND SURRENDER OF EXISTING SECURITIES AND AGREEMENTS

Notwithstanding any provision of the Plan and except for First Lien Credit Facility Claims, Intercompany Claims and Debtors' Interests, on the Effective Date any promissory note, other instrument or security evidencing a Claim or Equity Interest shall be deemed cancelled.

## H. NONCONSENSUAL CONFIRMATION

If any impaired class of Claims entitled to vote shall not accept the Plan by the statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Article XIII. B. of the Plan, solely with the consent of the Supporting Second Lien Lenders and the Second Lien Agent, or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

## I. ISSUANCE OF NEW SECURITIES

On or prior to the Effective Date, Reorganized TCMI shall issue (i) 90% of the New Common Stock to the holders of Allowed Second Lien Credit Facility Claims and (ii) 5% of the New Common Stock to the holders of Preferred Stock Equity Interests, provided that Class 11 votes to accept the Plan, each pursuant to the terms of the Plan. In addition, 5% of the New Common Stock will be reserved for distribution in accordance with the terms set forth in the Management Incentive Plan. The Debtors shall be reasonably satisfied that the issuance of such New Common Stock to the holders of Allowed Class 3 Claims, Class 11 Interests, and participants in the Management Incentive Plan, as contemplated in the Plan, shall be exempt from registration under the Securities Act and any state or local laws requiring registration for the offer or sale of securities.

The issuance of the New Common Stock be Reorganized TCMI is authorized without the need for any further corporate actions or without further action by a Holder of Claims or Equity Interests. The total number of shares of capital stock authorized under the Amended and Restated Governing Documents of Reorganized TCMI shall be [__] shares. All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. Each distribution and issuance referred to in Article VII of the Plan shall be governed by the terms and conditions set forth therein, applicable to such distribution or issuance, which terms and conditions shall bind each Entity receiving such issuance or distribution.

Upon the Effective Date, in the event the Supporting Second Lien Lenders determine that a Registration Rights Agreement and/or Shareholder Agreement are advisable, then Reorganized TCMI shall enter into such agreements with each entity that is to be a counter-party thereto or

such agreements shall be deemed to be valid, binding and enforceable in accordance with the respective terms and each holder of New Common Stock shall be bound thereby, in each case, without the need for execution by any party thereto other than Reorganized TCMI, which execution shall be deemed to occur without any further action upon the confirmation of the Plan. Notwithstanding the foregoing, the holders of New Common Stock may be permitted to be signatories to the Shareholders Agreement and Registration Rights Agreement (if any) if they so desire.

## J.     NEW SECOND LIEN DOCUMENTS

Upon the Effective Date, Reorganized TCMI shall enter into the New Second Lien Documents with each entity that is to be a counter-party thereto or such agreements shall be deemed to be valid, binding and enforceable in accordance with the respective terms and each holder of the New Notes shall be bound thereby, in each case, without the need for execution by any party thereto other than Reorganized TCMI, which execution shall be deemed to occur without any further action upon the confirmation of the Plan. Notwithstanding the foregoing, the holders of New Notes may be permitted to be signatories to the New Second Lien Documents if they so desire.

## K.     PROVISIONS REGARDING CORPORATE GOVERNANCE

### 1.     <u>Management</u>

#### (a)     *The Initial Board of Directors.*

The Reorganized TCMI Board of Directors will consist of five (5) persons, of which (i) four (4) members shall be designated by the Supporting Second Lien Lenders, and (ii) one member which shall be the Chief Executive Officer of Reorganized TCMI. The number of directors for the Board of Directors for the remaining Reorganized Debtors will be disclosed in the Plan Supplement. The directors of each Debtor on the day immediately preceding the Effective Date that are not otherwise appointed as members of the Board of Directors of the Reorganized Debtors shall be deemed to have resigned from the board of directors of such Debtor as of the Effective Date. The identities, affiliations and the amount of compensation of the Board of Directors of the Reorganized Debtors will be disclosed in the Plan Supplement, [which shall be filed no later than ten (10) days prior to the Confirmation Hearing.]

#### (b)     *Management of the Reorganized Debtors.*

The management and officers of the Reorganized Debtors shall be substantially the same as existing management and officers, and shall serve in accordance with any employment agreement with the Reorganized Debtors and applicable nonbankruptcy law, as the case may be. The terms of such employment agreement shall be set forth in a document to be included in the Plan Supplement.

#### (c)     **Amended and Restated Governing Documents**