The adoption of the Amended and Restated Governing Documents shall be deemed to have occurred and be effective as of the Effective Date without any further action by the directors, stockholders, partners or members (as the case may be) of the Debtors or the Reorganized Debtors, as applicable. The Amended and Restated Governing Documents will, among other things, contain appropriate provisions (i) governing the authorization of shares in Reorganized TCMI, and (ii) prohibiting the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code. On or prior to the Effective Date, the Debtors will, if required by applicable state law, file with the Secretary of State of the appropriate jurisdiction the Amended and Restated Governing Documents.

## 2. The Reorganized Debtors' Management Incentive Plan

The Management Incentive Plan shall be implemented by the Reorganized TCMI Board of Directors after the Effective Date.

## 3. Effectuating Documents; Further Transactions

On or after the Effective Date, the Reorganized Debtors and their officers and directors are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the terms and conditions issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations or consents except those expressly required pursuant to the Plan.

## L. SUBSTANTIVE CONSOLIDATION OF THE DEBTORS

Solely in connection with Distributions to be made on the Initial Distribution Date to the holders of Allowed Claims which are Allowed as of such date, the Plan is predicated upon, and it is a condition precedent to Confirmation of the Plan, that the Court provide in the Substantive Consolidation Order for the substantive consolidation of the Chapter 11 Cases of the Debtors into a single Chapter 11 Case solely for purposes of the Plan and the Distributions thereunder. To the extent a Claim (including any Disputed Claim) becomes an Allowed Claim or an Unliquidated Claim is liquidated in accordance with the provisions of the Plan after the Initial Distribution Date, such Claim shall be satisfied in accordance with the provisions of the Plan by the Reorganized Debtors; provided, however, that the Reorganized Debtors may satisfy such Claim in any other manner the Reorganized Debtors deems reasonable, so long as the treatment of such Claim is otherwise in accordance with the provisions of the Plan.

Pursuant to such Substantive Consolidation Order (i) all assets and liabilities of the Substantively Consolidated Debtors will be deemed to be merged solely for purposes of the Plan and Distributions to be made hereunder on the Initial Distribution Date, (ii) the obligations of each Debtor will be deemed to be the obligation of the Substantively Consolidated Debtors solely for purposes of the Plan and Distributions hereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the Substantively Consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be

deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the substantive consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and distributions made by any Debtor hereunder will be deemed to be made by the Substantively Consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the Substantively Consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for distribution to such Class without regard to which Debtor was originally liable for such Claim. Such substantive consolidation shall not affect (a) the legal and corporate structure of the Reorganized Debtors or (b) other pre- and post-Petition Date guarantees that are required to be maintained (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed or (ii) pursuant to the express terms of the Plan. The substantive consolidation proposed herein shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6). Such obligations shall continue until an order is entered closing, dismissing or converting such Debtor's Chapter 11 Case.

Unless the Court has approved the substantive consolidation of the Estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Estates. If no objection to substantive consolidation is timely filed and served, then the Substantive Consolidation Order may be entered by the Court. If any such objection(s) is timely filed and served, a hearing with respect to the substantive consolidation of the Estates and the objection thereto shall be scheduled by the Court, which hearing may coincide with the Confirmation Hearing.

The Debtors reserve the right at any time up to the conclusion of the Confirmation Hearing to withdraw their request for substantive consolidation, to seek Confirmation if the Plan as if there were no substantive consolidation, and to seek Confirmation of the Plan with respect to one or more Debtors even if Confirmation with respect to other Debtors is denied.

## M.    EFFECT OF CONFIRMATION OF THE PLAN

### 1.    <u>Continued Corporate Existence</u>

Each of the Reorganized Debtors shall continue to exist on and after the Effective Date as a separate legal entity with all of the powers available to such legal entity under applicable law and pursuant to the applicable Amended and Restated Governing Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. On and after the occurrence of the Effective Date, the Reorganized Debtors shall be authorized to operate their respective businesses, and to use, acquire or dispose of assets without supervision or approval by the Court, and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules, subject only to the terms and conditions of the Plan as well as the documents executed and delivered in connection herewith, including without limitation, the documents and instruments included in the Plan Supplement.

## 2.  Dissolution of Committees

On the Effective Date, except as provided below, any statutory committee(s) which may be appointed shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with these reorganization cases, and the retention of any committee(s), attorneys, accountants and other agents, if any, shall terminate, except for the purpose of filing and prosecuting applications for final allowance of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith.

## 3.  Vesting of Property

Except as otherwise expressly provided in the Plan, on the Effective Date, or as soon as practicable thereafter, the Reorganized Debtors shall be vested with all of the property of the Estates free and clear of all Claims, Liens, encumbrances, charges and other interests of Creditors and Equity Interest holders.

## 4.  Discharge of the Debtors

**Except as otherwise provided in the Plan, and conditioned on the making of the Distributions to be made under the Plan, the rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims or Equity Interests of any kind or nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, the Debtors in Possession, and the Reorganized Debtors, or any of their respective assets or properties, arising prior to the Effective Date. Except as otherwise expressly specified in the Plan, the Confirmation Order shall act as of the Effective Date as a discharge of all debts of, Claims against, Liens on, and Equity Interests in the Debtors, their respective assets and properties, arising at any time before the Effective Date, regardless of whether a proof of Claim or Equity Interest with respect thereto was filed, whether the Claim or Equity Interest is Allowed, or whether the holder thereof votes to accept the Plan or is entitled to receive a Distribution thereunder. Except as otherwise expressly specified in the Plan, after the Effective Date any holder of such discharged Claim or Equity Interest shall be precluded from asserting any other or further Claim against, or Interest in, the Debtors, the Reorganized Debtors, or any of their respective assets or properties, based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date.**

## 5.  Mutual Releases

**On and after the Effective Date, the Released Parties shall be deemed to and hereby unconditionally and irrevocably release each other from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), relating to any act, omission, transaction, event or other**

occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, or the Plan, except that (i) no individual shall be released from any act or omission that constitutes gross negligence, willful misconduct or fraud, (ii) the foregoing release shall not apply to any express contractual or financial obligations owed to the Debtors or the Reorganized Debtors or any right or obligation arising under or that is part of the Plan or an agreement entered into pursuant to, in connection with or contemplated by, the Plan.

6.    Releases by Non-Debtors of Non-Debtor Released Parties

On and as of the Effective Date, all Persons entitled to vote to accept or reject the Plan as set forth on the relevant Ballot and vote to accept the Plan shall be deemed, by virtue of their treatment contemplated under the Plan, to have forever released, discharged and covenant not to sue or otherwise seek recovery from any Released Party on account of any and all Claims or Equity Interests, including but not limited to claims, interests obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Equity Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that (i) none of the Released Parties shall be released from any claim based on any act or omission that constitutes gross negligence, willful misconduct or fraud, (ii) the foregoing release shall not apply to rights or obligations arising under or that are part of the Plan or an agreement entered into pursuant to, in connection with, or contemplated by, the Plan and (iii) the foregoing release shall not be construed to prohibit a party in interest from seeking to enforce the terms of the Plan or an agreement entered into pursuant to, in connection with, or contemplated by, the Plan.  Notwithstanding anything to the contrary in the Plan, the releases of the Released Parties shall extend only to Claims arising against such Released Parties in their capacities as parties in interest in the Chapter 11 Cases.

7.    Exculpation

(a)    *Exculpation and Limitation of Liability.*  The Plan provides that the Exculpated Parties (i) shall have no liability whatsoever to any holder or purported holder of an Administrative Claim, Claim, or Equity Interest for any act or omission in connection with, or arising out of the restructuring, the Chapter 11 Cases, the Plan, the Disclosure Statement, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement Documents or related agreements, instruments or other

documents, the pursuit of approval of the Disclosure Statement or the solicitation of votes for confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, or any transaction contemplated by the Plan, the Disclosure Statement or the Purchase Agreement or in furtherance thereof except for any act or omission that constitutes gross negligence, willful misconduct or fraud as determined by a Final Order, and (ii) in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and other applicable law or rules protecting any of the Exculpated Parties from liability.

*(b)* *Limitation on Governmental Releases.* Notwithstanding Articles XI. C., D., E., F. and G. of the Plan, the Plan shall not release, discharge, or exculpate any non-Debtor party from any debt owed to the United States Government and/or its agencies, (the "U.S. Government"), or from any liability arising under the Internal Revenue Code, or the environmental laws, securities laws or criminal laws of the United States. In addition, notwithstanding Articles XI. D. and H. of the Plan, the Plan shall not enjoin or prevent the U.S. Government from collecting any such liability from any such non-Debtor party.

8. Injunction

Except as otherwise expressly provided in the Plan, the Confirmation Order, the Plan Supplement Documents, or a separate order of the Court, all persons who have held, hold, or may hold Claims against, or Equity Interests in, the Debtors that arose before or were held as of the Effective Date, are permanently enjoined, on and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtors, or the Reorganized Debtors, with respect to any such Claim or Equity Interest, or against the Non-Debtor Released Parties with respect to Claims subject to Article XI. E., F., or G. of the Plan, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors or the Reorganized Debtors on account of any such Claim or Equity Interest, (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, or the Reorganized Debtors, or against the property or interests in property of the Debtors, or the Reorganized Debtors, on account of any such Claim or Equity Interest and (d) asserting any right of setoff, recoupment or subrogation of any kind against any obligation due from the Debtors, or the Reorganized Debtors, or against the property or interests in property of the Debtors, or the Reorganized Debtors, on account of any such Claim or Equity Interest, except to the extent such right of setoff, recoupment or subrogation is asserted with respect to an Allowed General Unsecured Claim. Such injunction shall extend to successors of the Debtors (including, without limitation, the Reorganized Debtors) and their respective properties and interests in property.

9. Setoff and Recoupment

The Reorganized Debtors will be permitted, but not required, to set off against any Claim, or the distribution to be made under the Plan on account of such Claim, any claims of any

nature whatsoever the Debtors have against the holder of such Claim. The Plan also provides that neither the failure to exercise any such setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the Reorganized Debtor of any such Claim the Reorganized Debtors may have against such Creditor.

### 10. Preservation of Causes of Action

The Reorganized Debtors shall retain all rights, including all legal and equitable defenses, and all Causes of Action accruing to the Debtors and their Estates, including but not limited to, those arising under sections 505, 544, 547, 548, 549, 550, 551, 553 and 1123(b)(3)(B) of the Bankruptcy Code, including all tax setoff and refund rights arising under section 505, other than as expressly provided below. Except as expressly provided in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such rights, legal or equitable defenses to Claims or Causes of Action. The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such Claims, Causes of Action, rights of setoff and other legal or equitable defenses that the Debtors have as fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim that are not specifically waived or relinquished by the Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced, including with respect to any Claim that the Plan provides shall be paid when and as such Claim becomes due and payable in the ordinary course of the Reorganized Debtors' business.

In recognition of the continued payment of General Unsecured Claims in the ordinary course of business throughout these Chapter 11 cases, the Reorganized Debtors shall waive on and as of the Effective Date all Causes of Action against the providers of goods and services to the Debtors in the ordinary course of the Debtors' business that accrued to the Debtors and their Estates under section 547 of the Bankruptcy Code.

### 11. Votes Solicited in Good Faith

As of the Confirmation Date, (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e), and any applicable non-bankruptcy law, rule, or regulation governing adequacy of disclosure in connection with such solicitation and (b) the Debtors, the Reorganized Debtors, and the Non-Debtor Released Parties, shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale or purchase of a security, offered or sold under the Plan and the Distributions contemplated thereunder and therefore, pursuant to section 1125(e) of the Bankruptcy Code, are not, and on account thereof will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the Distributions contemplated thereunder.

### 12. Administrative Claims Incurred After the Confirmation Date

Administrative Claims incurred by the Debtors' estates after the Effective Date, including, without limitation, Claims for Professionals' Fees and Expenses incurred after such date, may be paid by the Reorganized Debtors in the ordinary course of business and without the need for Court approval.

### 13. Operations of the Debtors Between the Confirmation Date and the Effective Date

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date.

### 14. Term of Bankruptcy Injunction or Stays

The Plan provides that all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## N. RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order at the occurrence of the Effective Date, the Plan provides that the Court shall retain exclusive jurisdiction over all matters arising out of, and related to the Plan, the Confirmation Order and the Chapter 11 Cases for, among other things, certain specified purposes as set forth in Article XII of the Plan to which reference should be made for a detailed description of the Court's retention of jurisdiction pursuant to the Plan.

## O. MISCELLANEOUS PROVISIONS

### 1. Payment of Statutory Fees and Completion of Quarterly Reports

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor as and when such fees become due.

### 2. Modification of the Plan

Subject to certain limitations specified therein, including, without limitation, obtaining the consent of the Supporting Second Lien Lenders and the Second Lien Agent, and limitations imposed by section 1127 of the Bankruptcy Code, Article XIII.B of the Plan permits the Debtors to modify the Plan pre and post confirmation. Reference should be made to Article XIII.B of the Plan for a complete description of the circumstances under which such modifications are permitted.

### 3. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflicts of law, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control), and corporate governance matters; provided, however, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated or otherwise organized in New York shall be governed by the laws of the state of incorporation or organization of the applicable Debtor or Reorganized Debtor, as applicable.

### 4. **Filing or Execution of Additional Documents**

On or before the Effective Date, upon receipt of the consent of the Supporting Second Lien Lenders and the Second Lien Agent, the Debtors shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 5. **Withholding and Reporting Requirements**

In connection with the Plan and all instruments issued in connection therewith and distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions thereunder shall be subject to any such withholding and reporting requirements.

### 6. **Securities Law Matters**

It is an integral and essential element of the Plan that the issuance of the equity securities of Reorganized TCMI pursuant to the Plan shall be exempt from registration under the Securities Act and any state or local laws requiring registration for the offer or sale of securities. Nothing in the Plan is intended to preclude the Securities and Exchange Commission from exercising its police and regulatory powers relating to the Debtors or any other entity.

### 7. **Tax Matters**

After the Confirmation Date, if any party to the Restructuring Support Agreement or the Reorganized Debtors determines, based on advice from outside tax counsel, that amending or otherwise modifying the provisions of the Plan would result in a tax benefit, or a reduction of adverse tax consequences, for such party without having a material adverse tax or material adverse economic impact on any party to the Restructuring Support Agreement or the Reorganized Debtors. such party may propose such amendments or modifications to the other parties by providing written notice containing the text of the proposed amendments or modifications and upon the request of any party to the RSA, a reasonably detailed tax analysis of their impact on all of the parties. Each of the parties listed in Article XIII. I. of the Plan agrees, for a period of twenty (20) days after the date of such notice, to negotiate in good faith amendments or modifications to the Restructuring Support Agreement and/or the Plan to achieve

the tax benefits, or reduce the adverse tax consequences, as outlined in such notice, provided that no party listed in Article XIII. I. of the Plan shall be obligated to agree to any amendment or modification that such party determines, in its own judgment after consulting with tax advisors, would have an adverse tax, economic or other impact on such party and, provided further that the foregoing covenant to negotiate in good faith shall not relieve any party listed in Article XIII. I. of the Plan of its other obligations contained in the Plan nor shall it be construed as a waiver of the performance by any other party hereunder.

### 8. Exemption From Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance and transfer, under the Plan, of Reorganized TCMI's equity interests, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan, shall not be subject to any stamp tax or other similar tax, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

### 9. Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance and distribution of the new common stock as contemplated by Article VII. B. of the Plan to Class 3 and Class 11, respectively, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of securities. In addition, under section 1145 of the Bankruptcy Code, such new common stock will be freely tradable by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments and subject to any restrictions in the Shareholders Agreement, and any restrictions that may be set forth in the New Organizational Documents.

### 10. Waiver of Bankruptcy Rule 3020(e) and Federal Rule of Civil Procedure 62(a)

The Debtors may request that the Confirmation Order include (a) a finding that Bankruptcy Rule 3020(e) and Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order and (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

### 11. Exhibits/Schedules

All exhibits and schedules to the Disclosure Statement, the Plan, and the Plan Supplement are incorporated into and constitute a part of the Disclosure Statement and the Plan as if fully set forth therein.

## 12. Plan Supplement

Forms of the documents relating to the Amended and Restated Governance Documents, a notice setting forth the identities, terms and nature of the compensation of the Reorganized Debtors' senior officers and directors and the employment contracts to be entered into with the Debtors' senior officers and such other documents and information as the Debtors determine to be necessary or appropriate to the implementation and/or confirmation of the Plan shall be contained in the Plan Supplement, which will be filed with the Clerk of the Court no later than the Plan Supplement Filing Date; provided, however, that the Debtors may amend any of the Plan Supplement Documents through and including the Effective Date in a manner consistent with the Plan. The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours. Holders of Claims or Equity Interests may also obtain a copy of the Plan Supplement upon written request to the Debtors or by downloading the Plan Supplement from the claims agent website at **www.kccllc.net/triplecrown**.

## 13. Conflict

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Supplement Documents, any exhibit or schedule to the Plan, or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

## 14. Setoff by the United States

The valid setoff rights, if any, of the United States of America will be unaffected by the Plan or confirmation thereof.

## 15. Successors and Assigns

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such entity.

## P. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Court, to assume, assign or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages, if any, incurred by reason of the rejection. In the case of the Debtors' rejection of leases of real property and employment agreements, such damage claims are subject to certain caps imposed by the Bankruptcy Code.

## 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

All executory contracts and unexpired leases of the Debtors that are not assumed during the Chapter 11 Cases and that are not either (i) rejected by the Debtors prior to the Effective Date, (ii) subject to a motion seeking such rejection as of the Effective Date, or (iii) identified in the Plan Supplement as executory contracts or unexpired leases for which the Debtors expressly reserve the right to seek to reject, shall be deemed to have been assumed by the Debtors (subject to Article VIII. B of the Plan) pursuant to sections 365 and 1123 of the Bankruptcy Code without further notice or order of the Court as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to Article VIII of the Plan shall revest in, and be fully enforceable by, the Reorganized Debtors in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Court.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including bankruptcy-related defaults. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## 2.    Cure

Any monetary amount by which any executory contract or unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, in accordance with section 365(b)(1) of the Bankruptcy Code, by payment of such amount in Cash, on the Effective Date, or upon such other terms as the Debtors or the Reorganized Debtors, as the case may be and the non-debtor party to such executory contract or unexpired lease may otherwise agree. In the event of a dispute regarding (i) Cure, or (ii) the ability of any Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, the assumption of such executory contract or unexpired lease shall be conditioned upon resolution of such dispute (the "Dispute Resolution") by the Court. The Debtors or the Reorganized Debtors reserve the right either to reject or nullify the assumption of an executory contract or unexpired lease that is subject to the Disputed Resolution no later than ten (10) days after a Final Order determining the Cure or any request for adequate assurance of future performance. Any payments required under the Cure under section 365(b)(1) of the Bankruptcy Code, if any, shall be made as soon as reasonably practicable following the entry of a Final Order resolving such dispute, or as the Debtors or the Reorganized Debtors, as the case may be, and the non-debtor party to such executory contract or unexpired lease may otherwise agree.

## 3.    Rejection Damage Claims

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be filed within thirty (30) days after the date of entry of an order of the Court approving such rejection. Any Claim arising from the rejection of an executory contract or unexpired lease for which proof of such Claim is not Filed within such time period shall forever be barred from assertion against the Debtors, the Reorganized Debtors, the Estates, and their property. Any Allowed Claim arising from the rejection of executory

contracts or unexpired leases for which proof of such Claim has been timely filed shall be, and shall be treated as, an Allowed General Unsecured Claim under the terms hereof, subject to any limitation under section 502(b) of the Bankruptcy Code, mitigation requirements under state law and/or otherwise.

### 4. Officers' and Directors' Indemnification Rights and Insurance

Notwithstanding any other provisions of the Plan, the obligations of the Debtors to indemnify their directors who serve in that capacity at any time during the pendency of the bankruptcy cases, and all present officers, and employees against any obligations, liabilities, costs or expenses pursuant to the articles of incorporation, by laws, partnership agreements or limited liability company operating agreements of the Debtors, as the case may be, applicable state law, specific agreement, or any combination of the foregoing, shall survive the Effective Date.

### 5. Reinstatement and Continuation of Insurance Policies

Unless otherwise assumed during the pendency of the Chapter 11 Cases, from and after the Effective Date, each of the Debtors' insurance policies in existence on and as of the Effective Date shall be reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtors pursuant to section 365 of the Bankruptcy Code.

The Debtors' discharge and release from all Claims and Equity Interests, as provided herein, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors, the Reorganized Debtors (including, without limitation, its officers and directors) or any other person or entity. Notwithstanding any other provision of the Plan or the Confirmation Order, nothing in the Plan shall (i) impair (w) the right of any insurer to defend against any claim asserted against such insurer, (x) an insurer's status as a secured creditor to the extent applicable under the terms of the Plan, including the right to recover from any Collateral (in accordance with the applicable insurance policy), (y) an insurer's right to draw on third-party letters of credit (in accordance with the terms of the applicable insurance policy and letter of credit) or (z) any insurer's right of setoff pursuant to section 553 of the Bankruptcy Code to the extent applicable and/or (ii) affect an insurer's right to seek arbitration of disputes between the Debtors and such insurer to the extent provided for under the terms of the applicable insurance agreement.

## Q. CONDITIONS PRECEDENT TO CONFIRMATION

### 1. Conditions Precedent to Confirmation

The Plan shall not be confirmed by the Court unless and until the following conditions have been satisfied in full or waived pursuant to Article X. C. of the Plan.

    a) The Restructuring Support Agreement shall not have been terminated and shall be in full force and effect;

b) The Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and the Supporting Second Lien Lenders; and

c) The Confirmation Order shall:

i) authorize the Debtors, with the consent of the Supporting Second Lien Lenders and the Second Lien Agent, and the Reorganized Debtors, to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan;

ii) decree that the provisions of the Confirmation Order and the Plan are non-severable and mutually dependent;

iii) authorize Reorganized TCMI to issue the new common stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements;

iv) decree that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

v) authorize that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

vi) provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of or in connection with the plan of reorganization, including any deeds, bills of sale or assignments executed in connection with any disposition or transfer of assets contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

d) All documents to be executed, delivered or filed pursuant to the Plan, including all Plan Supplement Documents, shall be in form and substance acceptable to the Debtors and the Supporting Second Lien Lenders.

## 2. __Conditions Precedent to Effectiveness__

The Plan shall not become effective unless and until it has been confirmed and the following conditions have been satisfied in full or waived pursuant to [Article X. C.] of the Plan:

a) The Confirmation Order, in form and substance acceptable to the Debtors and Supporting Second Lien Lenders shall have been entered, and no stay or injunction shall be in effect precluding the consummation of the

transactions contemplated by the Plan and such Confirmation Order shall not have been modified or vacated on appeal;

b)      All statutory fees then due and payable to the United States Trustee shall have been paid in full;

c)      All documents to be executed, delivered or filed pursuant to the Plan, including all Plan Supplement Documents, shall be in form and substance acceptable to the Debtors and the Supporting Second Lien Lenders, and such documents shall be executed, delivered or filed, as the case may be;

d)      The First Lien Amendment shall have been executed;

e)      All actions, authorizations, filings, consents and regulatory approvals required (if any) shall have been obtained, effected or executed in a manner acceptable to the Debtors and the Supporting Second Lien Lenders, and shall remain in full force and effect; and

f)      The Restructuring Support Agreement shall not be terminated and shall be in full force and effect.

### 3.      **Waiver of Conditions**

The Debtors may waive any or all of the conditions set forth in Articles X. A. and B. of the Plan at any time, upon receiving the prior written consent of the Supporting Second Lien Lenders, without leave or order of the Court and without any formal action.

### 4.      **Effect of Failure of Conditions**

In the event that the Effective Date does not occur on or prior to the Outside Date, unless such date is extended in accordance with the Restructuring Support Agreement upon notification submitted by the Debtors to the Court: (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claim or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### 5.      **Vacatur of Confirmation Order**

If (i) a Final Order denying confirmation of the Plan is entered, (ii) the Confirmation Order is vacated, and the Debtors revoke or withdraw the Plan, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner

any right, remedy or claim of the Debtors or any Creditor; or (d) be deemed an admission against interest by the Debtors or any Creditor.

6.    **Revocation, Withdrawal, or Non-Consummation**

*Effect of Withdrawal, Revocation, or Non-Consummation.* If the Debtors revoke or withdraw the Plan prior to the Effective Date, or if the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), the assumption or rejection of executory contracts, unexpired leases, insurance policies, or benefit plans effected by the Plan, any release, exculpation or indemnification provided for in the Plan, and any document or agreement executed pursuant to the Plan shall be null and void. In such event, nothing contained herein, and no acts taken in preparation for consummation of the Plan, shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interests in the Debtors or any other Person, to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or to constitute an admission of any sort by the Debtors or any other Person.

## IX.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES
## OF THE PLAN

*IRS CIRCULAR 230 NOTICE REQUIREMENT:* **TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF UNITED STATES FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.**

The following discussion summarizes certain federal income tax consequences of the implementation of the Plan to the Debtors and the holders of certain Claims, based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Regulations promulgated thereunder, judicial authority and current administrative rulings and practice. This summary does not address the federal income tax consequences of the Plan to holders of Claims that are unimpaired, satisfied in full or deemed rejected or equity interests that are extinguished without a distribution in exchange therefor.

This discussion is for informational purposes only and should not be relied upon for purposes of determining the specific tax consequences of the Plan to a particular holder of a Claim. Only the principal United States federal income tax consequences of the Plan to Debtors

and certain holders of Claims are described below. This discussion applies only to holders that hold the Claims as "capital assets" within the meaning of Tax Code Section 1221. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service ("IRS") or any other taxing authority have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or any other taxing authority. No assurance can be given that the IRS or any other taxing authority would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary is based upon existing United States federal income tax law, which is subject to change, possibly with retroactive effect. This discussion does not address all aspects of United States federal income taxation that may be relevant to certain holders in light of their particular circumstances (all of whom may be subject to tax rules that differ significantly from those summarized below), such as holders to whom special tax treatment applies, including (1) banks, regulated investment companies, real estate investment trusts, insurance companies, employee stock ownership plans, brokers, dealers in securities or currencies, subchapter S corporations, entities treated as partnerships for federal income tax purposes, and tax exempt organizations, (2) persons who hold Claims or who will hold New Notes or New Common Stock as part of a straddle, hedge, conversion transaction or other integrated investment, (3) persons whose functional currency is not the U.S. dollar and (4) persons that use a mark to market method of accounting. In addition, except where expressly indicated, this discussion does not address alternative minimum taxes or state, local or non-U.S. taxes. Furthermore, estate and gift tax issues are not addressed herein.

This summary does not discuss any state, local or non-U.S. tax considerations. In addition, this summary does not address the possible application of Tax Code provisions and U.S. Treasury regulations concerning reportable transactions, which include transactions with respect to which, under certain circumstances, taxpayers claim losses.

**This summary is not intended to constitute a complete analysis of all tax considerations relevant to a particular holder of a Claim. Each holder of a Claim should seek advice from its own independent tax advisors concerning the United States federal, state, local, foreign income and other tax consequences of the Plan to it in light of its particular circumstances.**

## A.    TAX CONSEQUENCES TO DEBTORS

### 1.    <u>Cancellation of Indebtedness and Reduction of Tax Attributes.</u>

In general, outside of Title 11 bankruptcy proceedings, a debtor will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of cash paid and the fair market value of any other consideration (including stock of the Debtors) given

in satisfaction of such indebtedness at the time of the exchange. The amount of COD Income will depend, in part, on the value of the equity of the Reorganized Debtors, which might not be known prior to the Effective Date. No COD Income is realized for cancelled debt the payment of which would have given rise to a deduction.

A taxpayer in bankruptcy does not include COD Income in its gross income if the discharge is granted or effected pursuant to a plan approved by the bankruptcy court. However, to the extent there is any COD Income that is excluded from gross income under this rule, the Reorganized Debtors must (as of the first day of the next taxable year following the Effective Date) reduce their tax attributes by the amount of COD Income which it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"), (b) general business and minimum tax credit carryovers and capital loss carryovers, (c) tax basis in assets, and (d) foreign tax credit carryovers. Under Section 108(b)(5) of the Tax Code, a taxpayer may elect to first apply the reduction to the basis of the taxpayer's depreciable assets, with any remaining balance applied to the other tax attributes in the order stated above.

The Debtors are expected to realize COD Income upon the consummation of the Plan, particularly in connection with the distribution under the Plan to the holders of a Second Lien Credit Facility Claim in discharge of such Claims. The amount of COD Income to be realized by the Debtors will depend, in part, on the value of the New Common Stock issued to the holders of the Second Lien Credit Facility Claims, which might not be known prior to the Effective Date. The Debtors will not be required to include COD Income in gross income because the indebtedness will be discharged while the Debtors are under the jurisdiction of a court in a Title 11 case. Instead, the Debtors will be required to reduce tax attributes by the amount of the COD Income realized. The Debtors have not yet determined whether it would be beneficial to elect to reduce the basis of their depreciable property prior to any reduction of NOLs or other tax attributes.

The extent to which the Debtors' NOLs and other tax attributes remain following tax attribute reduction, and the extent of the reduction in the basis of the Debtors' assets, will depend upon the amount of the COD Income. The Debtors have not analyzed the tax consequences or the impact on NOLs and other tax attributes that may be occasioned by the consummation of the Plan. However, the COD Income realized by the Debtors could be significant and the resulting tax attribute reduction could significantly reduce the Reorganized Debtors' NOLs and other tax attributes.

The forgiveness of accrued and unpaid interest on the Second Lien Credit Facility pursuant to the Plan will result in COD Income to the Reorganized Debtors to the extent that such accrued and unpaid interest has been previously deducted by the Reorganized Debtors for federal income tax purposes. Any such COD Income would be excluded from the Reorganized Debtors' gross income and applied to reduce the Reorganized Debtors' tax attributes as described above.

2. **Limitation on Net Operating Loss Carryforwards and Other Tax Attributes**

Following the implementation of the Plan, any remaining NOLs (including current year NOLs) capital loss and tax credit carryforwards and, possibly, certain other tax attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "pre-change losses") may be subject to limitation under Sections 382 and 383 of the Tax Code as a result of the change in ownership of the Reorganized Debtors. These limitations apply in addition to, not in lieu of, the attribute reduction resulting from the discharge of Claims pursuant to the Plan.

Under Section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. Such a limitation also may apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and that are subsequently recognized, as described further below.

The issuance of the New Common Stock to the holders of the Second Lien Credit Facility Claims pursuant to the Plan will constitute an "ownership change" of the Debtors for these purposes.

In general, the amount of the annual limitation to which a corporation (or consolidated group) would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (4.48% for ownership changes occurring in September 2009). For a corporation (or consolidated group) in bankruptcy that undergoes the change of ownership pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change, after giving effect to the surrender of creditors' claims.

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero.

If a loss corporation (or consolidated group) has a net unrealized built-in loss exceeding certain threshold amounts at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as pre-change losses and subject to the annual limitation. Conversely, if the corporation (or consolidated group) has a net unrealized built-in gain exceeding certain threshold amounts at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income. The Debtors have not

yet determined whether they will be in a net unrealized built-in loss or built-in gain position on the Effective Date.

An exception to the foregoing annual limitation rules generally applies where creditors and shareholders receive, in respect of their qualified claims and stock, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a chapter 11 plan (the "Section 382(l)(5) exception"). A claim is a qualified claim if it has been held by the creditor continuously for the 18 months prior to the Petition Date or it arose in the ordinary course of the debtor's trade or business and has been held by the person who has at all timed held beneficial interest in the claim. Under this exception, a debtor's pre-change losses are not limited on an annual basis. Instead, its NOLs, and possibly other tax attributes, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the reorganization date, in respect of all debt converted into stock in the bankruptcy proceeding. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period after the consummation of the chapter 11 plan will preclude the debtor's future utilization of any pre-change losses existing at the time of the subsequent ownership change.

The receipt of the New Common Stock by the holders of the Second Lien Credit Facility Claims and Preferred Stock Equity Interests pursuant to the Plan is expected to qualify for the Section 382(l)(5) exception with respect to the pre-change losses of the Debtors, although this will depend on the facts in existence at the time the Plan becomes effective. However, even if the Debtors do qualify for the Section 382(l)(5) exception, the Debtors may determine that it is more advantageous not to have the Section 382(l)(5) exception apply and instead elect to remain subject to the annual limitation described above. The Debtors have not yet determined whether it will be more advantageous for the Reorganized Debtors to use the Section 382(l)(5) exception or to elect out of it.. However, the Reorganized Debtors may wait until the due date for the filing of their tax return for the year including the Effective Date to decide whether to elect out of the Section 382(l)(5) exception.

### 3.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income for the year at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change within the meaning of Section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its

assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

## B.    TAX CONSEQUENCES TO HOLDERS OF PREFERRED STOCK

Pursuant to the Plan, holders of Preferred Stock Equity Interests will receive New Common Stock in exchange for their Preferred Stock Equity Interests. The exchange of New Common Stock for Preferred Stock Equity Interests should qualify as a tax-free "E" reorganization. Accordingly, the holders of Preferred Stock Equity Interests will not recognize any gain or loss upon the exchange of their Preferred Stock Equity Interests. A holder's basis in the New Common Stock will equal the holder's basis in the Preferred Stock Equity Interests received for the New Common Stock.

## C.    TAX CONSEQUENCES TO HOLDERS OF CERTAIN ALLOWED CLAIMS

Under the Plan, the holders of a Second Lien Credit Facility Claim will receive New Common Stock and New Notes in satisfaction and discharge of their Claims. The U.S. federal income tax treatment to a holder of a Second Lien Credit Facility Claim depends, in part, on whether (i) such Claim constitutes a "security" of the Debtors for federal income tax purposes, and (ii) a New Note constitutes a "security" of the Reorganized Debtors for federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations promulgated thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a "security" generally depends on an overall evaluation of the nature of the original debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten years or more constitute securities. In addition, the IRS ruled that a debt instrument with a term of two years could be a security if received in a reorganization in exchange for a former security that was in substantially the same form (including maturity date), but had a different interest rate. Because the original term of the Second Lien Credit Facility and the New Notes is five years there is no clear answer as to whether the Second Lien Credit Facility and the New Notes constitute a "security" for federal income tax purposes. Accordingly, for purposes of the following discussion, no assumption has been made as to whether the Second Lien Credit Facility and the New Notes constitute "securities" and holders of Second Lien Credit Facility Claims are urged to consult their tax advisors regarding the status of their Claims and the New Notes as "securities" for federal income tax purposes.

### 1.    Recognition of Gain or Loss

*If Second Lien Credit Facility is not a "Security"*. If the Second Lien Credit Facility is not a "security" for federal income tax purposes, then the receipt of New Common Stock and New Notes in satisfaction and discharge of their Claims should be a fully taxable transaction. Accordingly, a holder of a Second Lien Credit Facility Claim generally will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in

satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). For a discussion of the federal income tax consequences to holders of any Claim for accrued interest, see below. Generally, the "amount realized" by a holder will equal the sum of the issue price of any New Notes and the fair market value of any shares of New Common Stock.

Where gain or loss is recognized by a holder in respect of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was originally issued at a discount or was acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction in respect of such Claim. A holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of such Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

In general, a holder's tax basis in any New Notes will equal the issue price of such notes. A holder's tax basis in any New Common Stock will equal the fair market value of the stock. A holder's holding period for any New Common Stock and New Notes generally will begin the day following the issuance of such stock and notes.

*If both Second Lien Credit Facility and the New Notes are a "Security".* If the Second Lien Credit Facility and the New Notes are both "securities" for federal income tax purposes, then the receipt of New Common Stock and New Notes in satisfaction and discharge of the Claims should be a fully nontaxable transaction. Accordingly, a holder of a Second Lien Credit Facility Claim generally will not recognize gain or loss on the transaction (other than in respect of any Claim for accrued but unpaid interest). In general, a holder's tax basis in New Notes and New Common Stock received for a Second Lien Credit Facility Claim will equal the holder's tax basis in such Second Lien Credit Facility Claim. The holder's tax basis in such Second Lien Credit Facility Claim will be divided between the New Notes and New Common Stock received for a Second Lien Credit Facility Claim based on the relative fair market value of the New Notes and New Common Stock at the time of the transaction. A holder's holding period for any New Common Stock and New Notes generally will include the holder's holding period for the Claim.

*If the Second Lien Credit Facility is a "Security" and the New Notes are not a "Security".* If the Second Lien Credit Facility is a "security" and the New Notes are not "securities" for federal income tax purposes, then the holder of a Second Lien Credit Facility Claim will not recognize any loss upon the exchange of its Claim, but will recognize gain, if any, only to the extent of the fair market value (generally the issue price) of the New Notes received for the Claim. In general, a holder's tax basis in the New Notes received will be equal to the fair market value (generally the issue price) of such New Notes and the holding period for the New Notes will begin the day following the issuance of such notes. The holder's basis for the New Common Stock generally will equal the tax basis that the holder had in its Second Lien Credit Facility

Claim surrendered for such stock less the fair market value of the New Notes received for such Claim and increased by the amount of gain, if any, recognized by the holder on the transaction.

*Ownership and Disposition of New Notes.* Each holder of New Notes generally will be required to include in its gross income any interest payable to the extent such interest constitutes qualified stated interest with respect to such note in accordance with its regular method of tax accounting. The interest on the New Notes will constitute qualified stated interest to extent of the rate that is required to be paid in cash at least annually. In addition, the New Notes will be treated as issued with original issue discount ("OID") because a portion of the interest payments are "payment in kind" payments ("PIK") and not annual cash payments. In general, a debt instrument is treated as having OID to the extent its "stated redemption price at maturity" (in this case, the sum of all payments provided by the New Notes other than qualified stated interest) exceeds its "issue price," subject to a *de minimis* exception. The issue price of the New Notes should be their stated principal amount. Each holder generally will be required to accrue the OID in respect of the New Notes received and include such amount in gross income as interest over the term of such notes based on the constant yield method. Accordingly, each holder generally would be required to include amounts in gross income in advance of the payment of cash in respect of such income. A holder's tax basis in a New Note will be increased by the amount of any OID included in income and reduced by any cash received (other than payments of qualified stated interest) made with respect to such New Note.

### 2. Distributions In Discharge of Accrued but Unpaid Interest

A holder of Second Lien Credit Facility Claim will be treated as receiving an interest payment to the extent that a portion of the distribution to such holder is treated as paid with respect to accrued interest on its Claims. Any such amounts will be treated as ordinary taxable income for a holder that had not previously included such accrued interest in income. Where a holder has previously included such accrued interest in income, the holder should recognize an ordinary loss to the extent of the excess of the amount of accrued interest previously included in income over the amount treated as received in exchange for accrued interest. Pursuant to the Plan, all distributions in respect of any Second Lien Credit Facility Claim will be allocated first to the principal amount of such Claim and thereafter, to accrued but unpaid interest, if any. However, there is no assurance that such allocation will be respected by the IRS for federal income tax purposes.

## D. LIMITATION ON USE OF CAPITAL LOSSES

Holders of Second Lien Credit Facility Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For noncorporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Holders who have more capital losses than can be used in a tax year may be

allowed to carry over the excess capital losses for use in succeeding tax years. Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

## E.    INFORMATION REPORTING AND BACKUP WITHHOLDING

Payments of Second Lien Credit Facility Claims under the Plan may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

<h1 style="text-align:center">X.<br>CONFIRMATION PROCEDURES</h1>

## A.    CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on [_____, 2009], commencing at _____ .m. prevailing Eastern Time, before the Honorable _____, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801 or such other location as the Bankruptcy Court directs. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received by no later than [_____, 2009], at _____ .m. prevailing Eastern Time. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## B.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied. If so, the Bankruptcy Court shall enter the Confirmation Order. The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or

(b) subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after the Confirmation of the Plan.

- Either each holder of an Impaired Claim or Equity Interest has accepted the Plan, or will receive or retain under the Plan on account of that Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of each voting Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims will be paid in full on the Effective Date, or as soon thereafter as practicable.

- At least one Class of Impaired Claims or Equity Interests will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan unless such a liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Debtors believe that: (a) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (b) they have complied or will have complied with all of the requirements of chapter 11; and (c) the Plan has been proposed in good faith.

## 1.    Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that the Plan provides, with respect to each Class, that each holder of a Claim or Equity Interest in such Class either: (1) has accepted the Plan; or (2) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such person would receive or retain if Debtors liquidated under chapter 7 of the Bankruptcy Code.

To make these findings, the Bankruptcy Court must: (a) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case and the assets of such Debtor's Estate were liquidated; (b)

determine the distribution ("Liquidation Distribution") that each non-accepting holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each holder's Liquidation Distribution to the distribution under the Plan ("Plan Distribution") that such holder would receive if the Plan were Confirmed and consummated.

In chapter 7 liquidation cases, unsecured creditors and interest holders of a debtor are paid from available assets generally in the following order, with no junior Class receiving any payments until all amounts due to senior Classes have been paid fully or any such payment is provided for:

- secured creditors (to the extent of the value of their collateral);

- priority creditors;

- unsecured creditors;

- debt expressly subordinated by its terms or by order of the Bankruptcy Court; and

- equity interest holders.

As described in more detail in the Liquidation Analysis set forth in the Plan Supplement, the Debtors believe that the value of any distributions to creditors and equity interest holders in a chapter 7 case would be less than the value of distributions under the Plan because, among other reasons, distributions in a chapter 7 case may not occur for a longer period of time, thereby reducing the present value of such distributions. In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a period in order for a chapter 7 trustee and its professionals to become knowledgeable about these Chapter 11 Cases and the Claims against the Debtors. In addition, proceeds received in a chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale, and the fees and expenses of a chapter 7 trustee would likely further reduce Cash available for distribution.

## 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization, unless such liquidation is contemplated by the Plan. For purposes of showing that the Plan meets this feasibility standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their businesses upon emergence from bankruptcy.

The Debtors believe that with a significantly deleveraged capital structure, their business will be able to return to viability. The decrease in the amount of debt on Debtor's balance sheets will substantially reduce the Debtors' interest expense, improving their cash flow. Based on the terms of the Plan, at emergence the Reorganized Debtors will have approximately $50 million in

funded debt in contrast to nearly $75 million of funded debt and accrued interest prior to the restructuring.

The projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service their debt obligations and to fund operations. Accordingly, the Debtors believe the Plan complies with the financial feasibility standard section of 1129(c)(11) of the Bankruptcy Code.

## 3.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each Class of Claims or Equity Interests that is Impaired under the Plan accept the Plan. A Class that is not "impaired" under a plan is deemed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required. A Class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the Claim or Equity Interest entitles the Holder of that Claim or Equity Interest; (b) cures any default and reinstates the original terms of the obligation; or (c) provides that, on the consummation date, the holder of the Claim or Equity Interest receives Cash equal to the Allowed amount of that Claim or, with respect to any interest, any fixed liquidation preference to which the Equity Interest Holder is entitled or any fixed price at which the Debtors may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Under section 1126(d) of the Bankruptcy Code, a class of equity interests has accepted the plan if holders of such equity interests holding at least two-thirds in amount actually voting have voted to accept the plan.

The Claims and Equity Interests in Classes 1, 2, 4, 5, 6, 7, and 9 are not Impaired under the Plan, and as a result the Holders of such Claims and Equity Interests are deemed to have accepted the Plan.

Claims in Classes 3 and 11 are Impaired under the Plan, and as a result, the holders of such Claims are entitled to vote thereon. Pursuant to section 1129 of the Bankruptcy Code, the Claims in Classes 3 and 11 must accept the Plan in order for it to be confirmed without application of the "fair and equitable test," described below, to such Classes. As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of Creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Claims and Equity Interests in Classes 8 and 10 are also Impaired. The members of these Classes will not receive a distribution under the Plan and are not entitled to vote on the Plan.

4. **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if all impaired classes entitled to vote on the plan have not accepted it, *provided that* the plan has been accepted by at least one impaired class.

Section 1129(b) of the Bankruptcy Code states that, notwithstanding an impaired class's failure to accept a plan, the plan shall be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

In general, a plan does not discriminate unfairly if it treats a class substantially equivalent to how other classes that have equal rank are treated. Courts will take into account a number of factors in determining whether a plan discriminates unfairly, including the effect of applicable subordination agreements between parties. Accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the proceeds of such liens on proceeds are (b) for the realization by such holders of the indubitable equivalent of such claims.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or equity interest any property.

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan, on account of that equity interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled or (iii) the value of such interest; or (b) if the class does not receive such an amount as required under (a), no class of equity interests junior to the non accepting class may receive a distribution under the plan.

The Debtors submit that the Plan satisfies section 1129(b) of the Bankruptcy Code, and the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.

# XI.
## PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**HOLDERS OF CLAIMS AGAINST THE DEBTORS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A.    GENERAL

#### 1.    The Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein. The delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update the Disclosure Statement unless otherwise ordered to do so by the Court.

#### 2.    No Representations Outside The Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court of the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance, or rejection, of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

#### 3.    Information Presented Is Based On The Debtors' Books and Records, And No Audit Was Performed

While the Debtors have endeavored to present information fairly in this Disclosure Statement, because of the Debtors' financial difficulties, as well as the complexity of Debtors' financial matters, the Debtors' books and records upon which this Disclosure Statement is based might be incomplete or inaccurate. The financial projections included in the Plan Supplement were prepared by the Debtors and the Debtors' Financial Advisors. The projections have not been independently reviewed and are solely the product of the Debtors' judgment regarding future business operations based on historical data and present conditions.

#### 4.    All Information Was Provided By Debtors And Was Relied Upon By Professionals

Dinsmore & Shohl LLP was approved by the Bankruptcy Court to represent the Debtors effective as of the Commencement Date as bankruptcy counsel. All counsel and other

professionals for the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel for the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, counsel has not independently verified the information contained herein, except as required under Bankruptcy Rule 9011.

### 5. This Disclosure Statement Was Not Approved By The Securities And Exchange Commission

Although a copy of this Disclosure Statement was served on the SEC and the SEC was given an opportunity to object to the adequacy of this Disclosure Statement before the Bankruptcy Court approved it, this Disclosure Statement was not registered under the Securities Act or applicable state laws. Neither the SEC nor any state regulatory authority has passed upon the adequacy of this Disclosure Statement or the exhibits or statements contained herein, and any representation to the contrary is unlawful.

### 6. No Legal or Tax Advice Is Provided To You By This Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Creditor or holder of an Equity Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or Equity Interest.

### 7. Limited Net Operating Loss Carry-Forwards

The Debtors currently have significant net operating loss tax carry-forwards. As a result of the successful consummation of the Plan, the Debtors expect to realize cancellation of indebtedness income which, although excluded from the Debtors' gross income for federal income tax purposes, will be applied to substantially reduce and possibly eliminate their net operating loss tax carry-forwards. In addition, the Debtors will as a result of consummation of the Plan undergo an "ownership change" within the meaning of Section 382 of the Tax Code, and therefore the use of any remaining net operating loss tax carry-forwards to offset income generated in periods following the year of the restructuring may be limited. Even if the ownership change resulting from consummation of the Plan does not give rise to an annual limitation on the Debtors' ability to use their net operating loss carry-forwards because the Debtors are able to qualify for the exception set forth in Section 382(l)(5) of the Tax Code, a subsequent ownership change occurring within two years of the Effective Date would effectively eliminate the Debtors' ability to use any net operating loss carry-forwards arising in periods prior to the date of that second ownership change. For a more detailed discussion, see Article IX. of the Plan, entitled "Certain Federal Income Tax Consequences of Plan."

### 8. Key Personnel

The success of the Debtors depends in large part upon the abilities and continued service of the Debtors' executive officers and other key employees. There can be no assurance that the Reorganized Debtors will be able to retain the services of such officers and employees, including

substantially all of their salaried work force. The Reorganized Debtors' failure to retain the services of other key personnel could have a material adverse effect.

### 9. No Admission Made

Nothing contained herein shall constitute an admission of any fact or liability by any party (including without limitation, the Debtors) or be deemed evidence of the tax or legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests

## B. BANKRUPTCY LAW CONSIDERATIONS

### 1. Parties-In-Interest May Object to Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a class, or an interest, in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created eleven classes of Claims and Equity Interests, each encompassing Claims or Interests that are substantially similar to the other Claims or Equity Interests in each such class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. Failure To Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar to or as favorable to the Creditors as those proposed in the Plan.

### 3. The Debtors May Not Be Able to Secure Confirmation of the Plan

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Creditor or equity holder of Debtors might challenge the adequacy of this Disclosure Statement or the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

### 4. Nonconsensual Confirmation

In the event any Impaired Class of Claims or Equity Interests does not accept the Plan, the Court may nevertheless confirm the Plan at the Debtors' request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and as to each Impaired Class that has not accepted the Plan, the Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes.

### 5. The Effective Date Might Be Delayed Or Never Occur

There can be no assurance as to the timing of the Effective Date or that it will occur. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or been waived, the Confirmation Order shall be vacated in accordance with the Plan and such Confirmation Order. In that event, no Distributions would be made, and the holders of Claims or Equity Interests would be restored to their previous position as to the moment before Confirmation, and the Debtors' obligations for Claims and the Equity Interests would remain unchanged.

### 6. Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtors, or any other party in interest, may attempt to formulate an alternative chapter 11 plan which might provide for the liquidation of the Debtors' assets. Any attempt to formulate an alternative chapter 11 plan would unnecessarily delay creditors' receipt of distributions yet to be made and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Claims than are currently provided for in the Plan. Accordingly, the Debtors believe that the Plan will enable all Creditors to realize the greatest possible recovery on their respective Claims with the least delay.

### 7. Liquidation Under Chapter 7 Of The Bankruptcy Code

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Equity Interests are set forth in the Debtors' liquidation analysis, included in the Plan Supplement.

## C. FINANCING RISKS

### 2. Access To Financing and Trade Terms

The Debtors' operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage of or increased cost, of such financing and trade vendor support. The Debtors' post-petition operations have been financed from supplier trade terms, operating cash flows and use of cash collateral. The Debtors believe that substantially all of their needs for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by

projected operating cash flow and trade terms supplied by vendors. However, if the Reorganized Debtors require working capital and trade financing greater than that provided by such sources, they may be required either to (a) obtain other sources of financing or (b) curtail their operations.

No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtors. The Debtors believe that it is important to their going-forward business plan that their performance meet projected results in order to ensure continued support from vendors and other creditors.

### 4. Restrictive Covenants Contained In Future Indebtedness

The terms of any of the Reorganized Debtors' future indebtedness may contain certain covenants that limit the discretion of the Reorganized Debtors' management with respect to certain business, financial and operational matters.

The Reorganized Debtors' ability to comply with any such provisions may be affected by changes in economic or business conditions or other events beyond the Reorganized Debtors' control. A failure to comply with such obligations could result in an event of default, which could result in acceleration of the related debt and the acceleration of debt under other instruments evidencing indebtedness that may contain cross-acceleration or cross-default provisions. If the indebtedness under any loan facility were to be accelerated, the Reorganized Debtors' assets may not be sufficient to repay in full such indebtedness. Also, if the Reorganized Debtors were unable to borrow due to a default or failure to meet certain specified prerequisites for borrowing, they could be left without sufficient liquidity to conduct their business.

## D. BUSINESS FACTORS AND COMPETITIVE CONDITIONS

### 1. General Economic Conditions

In their financial projections, the Debtors assume a steady economic condition of the United States economy over the next several years. Economic conditions are subject to many factors outside of the Debtors' control, including interest rates, exchange rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors. Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtors. There is no guarantee that economic conditions will remain steady in the future.

### 2. Local Economic Conditions

The Debtors depend on the economies and the demographics of the local communities that their newspaper publications serve and are also susceptible to general economic downturns, which could adversely affect their advertising and circulation revenue and their profitability. The Debtors' advertising revenue and, to a lesser extent, circulation revenue depend upon a variety of factors specific to the communities that their publications serve. These factors include, among other (a) local economic conditions in general; (b) the economic condition of the retail

segments of the communities that their publications serve; (c) the popularity of their publications; (d) the size and demographic characteristics of the local population; (e) pricing fluctuations in local and national advertising; (f) the activities of their competitors, including increased competition from other forms of advertising-based mediums; and (g) changing consumer lifestyles.

### 3. Competitive Conditions

In the newspaper industry, the Debtors rely on advertising and paid circulation revenue, for which they face competition from other newspapers, including significantly larger newspapers, as well as other communications, media and web-based sources. Competition for newspaper advertising expenditures is based largely upon advertiser results, readership, advertising rates, demographics and circulation levels.

### 4. Increases in Newsprint Costs Could Have a Material Adverse Effect on the Debtors' Operating Results.

The basic raw material for newspapers is newsprint. Historically, the industry price of newsprint has been cyclical and volatile. The average price of newsprint was $610 and $643 per metric ton during the twelve months ended June 30, 2008 and June 30, 2007, **[Do we have 2009 #'s?]** respectively. During the twelve months ended June 30, 2008, the Debtors consumed approximately 8,500 metric tons of newsprint, the cost of which represented approximately 10.5% of the total revenue from newspaper publishing during such period. The Debtors maintain a contract to purchase newsprint at prices pegged to industry averages and expect price increases in fiscal 2009 up to $100 per metric ton. Significant increases in newsprint costs could have a material adverse effect on the Debtors' operating results.

### 5. Environmental Concerns

The Debtors may incur significant capital and operating expenditures to achieve and maintain compliance with applicable environmental laws and regulations, or associated with environmental liabilities. If such expenses significantly exceed expectations, the Debtors operating income may be adversely affected. The Debtors' business is subject to a wide range of federal, state, and local environmental laws and regulations. The Debtors' failure to comply with applicable environmental laws and regulations or permit requirements could results in substantial civil or criminal fines or penalties or enforcement actions. As an owner and operator of real estate, the Debtors may be responsible under environmental laws and regulations for the investigation, remediation and monitoring, as well as associated costs, expenses and third party damages, including tort liability relating to past or present releases of hazardous substances on or from their properties. New environmental laws (or regulations or changes in existing laws) may be enacted that require significant expenditures by the Debtors. If the resulting expenses significantly exceed expectations, the Debtors operating income may be adversely affected.

### 6. The Reorganized Debtors May Be Unable To Secure Credit From Their Suppliers Of Goods And Services Which Would Have A Material Adverse Affect On Their Business.

The Debtors' relationships with vendors may be strained as a result of the financial stress and bankruptcy proceedings. Operations can be materially affected by the suppliers' willingness to extend unsecured credit to the Debtors. Vendors may impose reduced payment terms or require cash-in-advance payments for goods or services, which could impair the Debtors' ability to generate cash flow from operations.

## XII.
## CONCLUSION AND RECOMMENDATIONS

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims and Interests. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. The Debtors urge holders of Impaired Claims and Interests entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than [4:00 p.m., prevailing Eastern Time on _____, 2009].

Dated: Lawrenceville, GA
    _____, 2009

**TRIPLE CROWN MEDIA, INC.**

(for itself and on behalf of
each of the Debtors)

By: _____
Name: Mark G. Meikle
Title: Chief Financial Officer and Secretary